51 P.(2d) 864

**BUBANY v. NEW YORK LIFE INS. CO.**

No. 4052.

Supreme Court of New Mexico.

Oct. 16, 1935.

Rehearing Denied Dec. 11, 1935.

Francis C. Wilson and George E. Kessler, both of Santa Fé, for appellant.

W. A. Keleher and Theo. E. Jones, both of Albuquerque, and H. W. Atkins, of Gallup, for appellee.

SADLER, Chief Justice.

In an action for disability benefits under a policy of life insurance, the plaintiff (appellee here) recovered as the result of an injury suffered April 18, 1933.

Pertinent policy provisions are here quoted, as follows:

"And the company agrees to pay to the insured * * * One Hundred * * * Dollars each month ($10 per $1,000 of the face of this policy) during the lifetime of the Insured and also to waive the payment of premiums, if the Insured becomes wholly and presumably permanently disabled before age 60, subject to all the

terms and conditions contained in Section 1 hereof."

"Section 1—Disability Benefits

"1. Total Disability.—Disability shall be deemed to be total whenever the insured is wholly disabled by bodily injury or disease so that he is prevented thereby from engaging in any occupation whatsoever for remuneration or profit.

"2. Permanent Disability.—Disability shall be presumed to be permanent,—(a) Whenever the Insured will presumably be so totally disabled for life; or—(b) After the Insured has been so totally disabled for not less than three consecutive months immediately preceding receipt of proof thereof.

"3. Benefits.—Upon receipt at the Company's Home Office, before default in payment of premium, of due proof that the Insured is totally and presumably permanently disabled and that such disability occurred after the insurance under this Policy took effect and before its anniversary on which the Insured's age at nearest birthday is sixty years, the following benefits will be granted:

"(a) Income Payments.—The Company will pay to the Insured a monthly income of $10 per $1,000 of the face of the policy during his lifetime and continued disability, beginning immediately on receipt of said proof. Any income payment due before the Company approves the proof of disability shall be payable upon such approval. If disability results from insanity, income payments under this section will

be paid to the beneficiary in lieu of the Insured.

"(b) Waiver of Premiums.—The Company will waive payment of any premium falling due after approval of said proof and during such disability. Any premium due prior to such approval is payable in accordance with the terms of the policy, but if due after receipt of proof will, if paid, be refunded upon approval of proof.

"4. In the event of default in payment of premium after the insured has become totally disabled, the policy will be restored upon payment of arrears of premium with interest at 5%, provided due proof that the Insured is totally and presumably permanently disabled, as herein defined, is received by the Company not later than six months after said default and the benefits under this section shall then be the same as if said default had not occurred.

"5. It is further agreed that the total and irrecoverable loss of the sight of both eyes, or of the use of both hands or of both feet or of one hand and one foot shall be considered total and permanent disability."

In his application for the policy the plaintiff was asked: "What is your occupation?" His answer was: "Lumber dealer and hotel proprietor."

The evidence disclosed that plaintiff came as an immigrant to this country from Jugo-Slavia when about seventeen years of age. He had but a meager education when he landed. At the time of trial he could read very little English, and

could write it not at all, although he could sign his name. He worked first as a coal miner, finally acquiring a mine of his own. In it he performed the manual labor of mining along with other miners he employed, and himself "peddled" coal in the town of Gallup.

He first engaged in the lumber business in the year 1919. From the beginning he had some one employed to help run the business. After about two years he sold a one-half interest to a partner and the firm engaged a bookkeeper. In 1925 he sold his interest to his partner, engaging in the lumber business alone two weeks later.

From this time forward, as previously, the plaintiff had some one employed to look after the office end of the business, first a man by the name of Diggs, and then one W. W. Clark, both of whom appeared as witnesses for plaintiff at the trial. Each had worked for plaintiff previous to his retirement from the partnership venture in the lumber business.

Throughout plaintiff's connection with the lumber business, it appears his duties were largely those of the "outside" man, involving considerable manual labor, as well as supervision.

The witness Clark testified:

"Q. What were your duties around his place of business there between the time you went to work for him in 1922 and April 18, 1933, when he was hurt? A. Taking care of the office details, such as bookkeeping, taking care of the correspondence, all that sort of thing.

"Q. What were his duties around the place between the time you spoke of 1922 and April 1933? A. Why he at all times saw that orders were gotten out, helped unload cars, saw that stuff was put in place and in bins, and generally kept up the outside end of the business, outside of the office."

The same witness stated that in connection with unloading cars of lumber "he (plaintiff) would be the man in charge, pulling stuff out, putting on trucks and helping the boys, seeing that they put stock in the shed in nice shape, stacking nicely, all grades together." And as to delivery of lumber, the plaintiff, according to this same witness, did "quite a bit of that." The witness said: "He has often taken out two or three big loads before I got down to work in the morning."

The witness Diggs testified:

"Q. When you were associated with him, what were your duties? A. They varied. I started work with George when he first opened up the yard, and I stacked lumber and other labor, took care of the books; general work around the yard.

"Q. What did he do in that enterprise? A. Well, he would unload cement, deliver lumber and take care of the stock; just general roustabout around the yard."

The plaintiff had same rental properties in Gallup including a hotel, but his duties in connection with other interests, in the trial court as well as here, have not been so much dwelt upon as have the duties of

his occupation as a "lumber dealer." At least we gather from the record that they had little influence in the disposition of the case below. The main argument revolves about the plaintiff's occupation as "lumber dealer," and whether by reason of what follows he sustained the burden of showing himself disabled within the fair meaning of the applicable policy provisions conferring disability benefits.

For, on April 18, 1933, while plaintiff was engaged in operating a ripsaw at his lumber yard, his left hand became entangled in the saw; the resulting injury necessitating amputation of the four fingers and thumb of said hand. He was confined to St. Mary's Hospital in Gallup for about two weeks and was under care of his physician five or six months.

Shortly after his discharge from the hospital, however, he began to frequent his place of business; the evidence conflicting as to the extent of his participation in the conduct of his lumber business thereafter, and as well upon the question of his ability to do so.

It appeared from the evidence that plaintiff had lost considerable weight, about 25 pounds, since the injury; that he was nervous, irritable, restless, and suffered from sleeplessness. The evidence also tended to show recurrence of an old stomach trouble following the injury. All testimony upon the subject is in accord, that he was strong physically before the injury, and able, as one witness considered, to do "an enormous day's work." Concerning

plaintiff's participation in the business since his injury, the witness Clark testified:

"Q. Since then, April 18, 1933, what have been his duties around the place? What, if anything, has he done in regard to the work there? A. He has taken no active part in it except to be around the store there and talk to friends and people who might come in, about all he would do.

"Q. Who does the work of actually attending to the office? A. I have had to do it myself.

"Q. To what extent per day would he participate in the conduct of that business since he was hurt? A. Why very little; occasionally talk over a few things with him and that is the extent of any participation.

"Q. What, if any, change have you noticed in his physical body since he was hurt? A. Why, he is, what I figure, a physical wreck now, so far as physical condition.

"Mr. Wilson: I object to that as a conclusion of the witness.

"The Court: Yes, that is stricken.

"Q. Just describe, Mr. Clark, the difference in his demeanor between the time he was what you call a good worker and the present time with reference to his facial (physical) appearance? What difference do you know and can testify to? A. Well, he has been losing flesh to quite an extent I think, and he is extremely nervous; he can't stay in the yard over ten or fifteen

minutes; walks up and down and go off and visit a while and come back, and doesn't concentrate on anything, and he is extremely nervous.

"Q. In what mannerisms is that nervousness exhibited? A. Oh, he paces up and down the floor two or three times and starts off up town and we never know where he is at, comes back in a couple of hours maybe longer than that.

"Q. You have been in that business a good many years every day. Would you say Mr. Bubany at any time since April 18, 1933, has been capable of attending to that business? A. No, sir.

"Q. Or any substantial part of it? A. No, sir.

"Q. Would you say he could be entrusted to do anything either outside work or inside work and carry it out successfully? A. No, sir.

"Q. What, if any, additional assistance has it been necessary for that concern there to engage since Mr. Bubany has been incapacitated? A. I hired my daughter to take over the office details and we put on another boy out in the yard.

"Q. Now, did, or not, your daughter relieve you of part of the work you used to handle? A. Yes, sir. I couldn't devote the necessary attention to it any more. I had to be out waiting on customers, getting stuff out, things George used to do himself, and I just couldn't do it.

"Q. What does this boy that was employed do with reference to the duties that were formerly performed by George Bubany? A. Well, he just supplements, in as much as he can, the others. One man could hardly take George's place. It requires a little bit more help than when George was physically himself."

The added expense of the two employees rendered necessary in conduct of the business by reason of plaintiff's disability was $40 per week.

The witness Clark admitted plaintiff, as a rule, was down at his lumber yard every day, except at times he wouldn't "show up" for several days. Sometimes he came down early, sometimes quite late. The witness continued on cross-examination:

"Q. Would you say he is a pretty good judge of lumber? A. Yes, I would say he was a pretty good judge of lumber.

"Q. And a large proportion of his customers are old friends of his? A. Yes, sir.

"Q. Deal with you because they have confidence in him, in the honesty of his dealings? A. That goes a long ways, yes.

"Q. In fact that business is really built, in a large part, on his reputation for honesty and integrity and capacity and knowledge of his line, united with your own work in keeping books correctly, is that correct? A. Why I would say that is about as near as I could put it."

Plaintiff himself testified on direct examination concerning his activities after the injury, as follows:

"Q. What do you do around that business there? A. I don't do hardly anything.

I just come down and see what the boys doing, you know, and stay an hour or two and then walk down town, and I don't do hardly anything. I talk to people then when they come down there.

"Q. Do you transact any business? A. No.

"Q. Do you do any of this work you say you used to do, such as load and unload lumber? A. I can't do that work; can't load any cars anymore and trucks, I can't do that any more."

But on cross-examination the plaintiff admitted that as to his builders' supplies, apparently a part of his lumber business, that both he and his office manager looked after that, both before and after the accident. He also agreed that he went down to his lumber yard almost every day for a short time in the forenoon and afternoon, claiming, however, that he didn't "stay much around."

Cross-examined touching his watchfulness over his lumber business, the plaintiff testified:

"Q. Mr. Bubany, after all it is the largest investment and you keep very close watch on it because you are a business man? A. Well, they call me a business man; I don't know if I am or not.

"Q. Well, we will assume you are, and as a good business man you keep close watch on your business? A. Yes, I watch everything. If I don't I go in the street and I have to watch it."

Mr. Diggs saw him around the lumber yard quite often "talking to people" and in the evening around in the little store building, saying: "He don't do any work I don't think now, just kinda help look after the business, manage it." The witness admitted that plaintiff "helps with customers sometimes, down there busy, looking after stuff."

His attending physician and surgeon following the injury gave it as his opinion that he was not able to do the class of work he had been accustomed to doing and that he was totally and permanently disabled from doing so, admitting, however, if he supervised his business before he might do so still.

Another physician testifying for the plaintiff gave an opinion touching the nature and extent of plaintiff's disability substantially to the same effect as that of his attending physician. This witness, on cross-examination, said he had no desire to change a report to defendant made by him a little more than two months after plaintiff's injury that he was capable of "managing his lumber business but doing none of the active work. Can supervise buying, unloading and other similar tasks connected with the lumber business. He would be able to put in eight hours a day."

Two physicians testifying for defendant thought a man in plaintiff's condition would be capable of supervising his lumber business. Both agreed that they found him in a run-down condition, but thought this condition could be relieved within a

comparatively short time by proper treatment.

The foregoing summary of the facts, interspersed with liberal quotations from the testimony of witnesses, presents the question whether the trial court should have directed a verdict for the defendant. In other words, are the facts conclusive against plaintiff's right to recover? If they are not, then, admittedly, it was the peculiar province of the jury to pass upon them.

Counsel for defendant has ably presented its viewpoint. Yet, we are not persuaded that within the facts and permissible inferences deducible therefrom is not to be found adequate support for a recovery; the jury having seen fit to award it.

■ The rule governing the construction of analogous policy provisions, as approved in Hayes v. Prudential Insurance Company, 114 W.Va. 323, 171 S.E. 824, is stated as follows: "Absolute helplessness is not deemed by the courts to be a condition precedent to the right of an insured to recover under a total and permanent disability clause. According to many cases, recovery may be had by an insured where, because of injury or illness, he has become unable to do substantially all the material acts necessary to the conduct or prosecution of his business or occupation in substantially his usual and customary manner."

The author of the A. L. R. annotation of the subject states the rule in the following language, to wit: "Recent decisions are in accord with the weight of authority in supporting the liberal rule that the 'total disability' contemplated by an accident policy, or a life insurance policy containing a disability clause, does not mean, as its literal construction would require, a state of absolute helplessness; but the total disability contemplated means inability to do all the substantial and material acts necessary to the prosecution of the insured's business or occupation, in his customary and usual manner." 79 A.L.R. 857, 858, Note.

■ Unless the trial court can say as a matter of law that insured is not totally and presumably permanently disabled within contemplation of appropriate provisions of the policy, fairly construed, then it becomes a question for the jury. Cantor v. Metropolitan Life Ins. Co., 108 Pa.Super. 1, 164 A. 145, 147; Kane v. Metropolitan Life Ins. Co., 228 Mo.App. 649, 73 S.W. (2d) 826; Rickey v. New York Life Ins. Co. (Mo.App.) 71 S.W.(2d) 88; Equitable Life Assur. Soc. v. Bagley, 188 Ark. 1009, 69 S.W.(2d) 394; Marchant v. New York Life Ins. Co., 42 Ga.App. 11, 155 S.E. 221; Prudential Ins. Co. v. Harris, 254 Ky. 23, 70 S.W.(2d) 949; Marshall v. Kansas City Life Ins. Co., 171 S.C. 321, 172 S.E. 504; Oswald v. Equitable Life Assur. Soc. (Neb.) 258 N.W. 41. See, also, the authorities cited and discussed in the exhaustive annotations appearing in 24 A.L.R. 203; 37 A.L.R. 151; 41 A.L.R. 1376; 51 A.L.R. 1048, and 79 A.L.R. 857; as well

as text discussions in 1 C.J. 462 and 14 R.C.L. 1315 et seq.

■ Applying the construction adopted in *Hayes v. Prudential Ins. Co.,* supra, which is supported by the weight of modern authority and appeals to us as sound in reason, we think the plaintiff, when the case closed, had adduced sufficient evidence to entitle him to have the jury say whether he was during the period covered by its award "unable to do substantially all the material acts necessary to the conduct or prosecution of any occupation in substantially the usual and customary manner." The issue was thus submitted in the trial court's instructions.

The defendant, it is true, adduced evidence from its own witnesses which, *believed*—and drew statements from plaintiff and his witnesses which, *characterized* by the jury as defendant's counsel here characterizes them—unquestionably would strongly support a verdict in defendant's favor. However, after careful review of the evidence, we do not regard the statements of plaintiff and his witnesses on cross-examination so unequivocally in contradiction of their testimony on direct as to deny the jury the right to reconcile in plaintiff's favor matters of apparent conflict, if so persuaded. At least, we feel we should invade the province of the jury, if we thus determined as a matter of law.

In the conclusion just made we have reversed somewhat the order of. treatment by defendant of its points relied upon for. reversal. We thus overrule the claimed error on the part of the trial court in denying defendant's motion for a directed verdict and for new trial, in so far as the motions are predicated upon claimed insufficiency of the evidence to sustain a recovery in any amount.

■ Another of defendant's claims of error challenges sufficiency of the proof to sustain burden resting on plaintiff of showing his injuries had wholly disabled him to the extent that he was prevented from engaging in *any occupation whatever* for remuneration or profit. What has already been said disposes of this point in so far as the proof relates to plaintiff's usual occupation, viz., that of lumber dealer. The point, however, is broad enough to sustain the argument that, even though under the proof plaintiff might be considered unable within the rule to follow his usual occupation, that, nevertheless, it did not show him unable to pursue some other occupation "for remuneration or profit."

The trial court's instructions upon this phase of the case were favorable to defendant's contention. Under them the jury could not find for plaintiff without relating the disability not alone to his usual occupation, but to "any occupation for remuneration or profit." It must have found him unable "to do substantially all of the material acts necessary to the prosecution of any business, employment or occupation in substantially the customary and usual manner" before awarding a recovery.

So embraced in the jury's verdict is a finding that the plaintiff was disabled with-

in the policy provisions from engaging "in any occupation for remuneration or profit," not alone his usual occupation. The finding has support in the evidence. We are thus spared the necessity of deciding, and do not decide, whether under the disability benefit clause before us an insured entitles himself to recover by merely showing himself presumably permanently disabled from pursuing his *usual* occupation. Cf. Nikolich v. S. N. P. J., 33 N.M. 64, 260 P. 849.

■ The only other occupation than that of lumber dealer in which the defendant, by the evidence, sought to show plaintiff capable of earning was as manager of certain rental properties and investments. The evidence was conflicting on the extent of his ability to manage said properties and on the extent of his actual participation in their management over the period in question. The mere fact that he had appreciable income from prior investments resulting from active management was of no consequence, except as ability in plaintiff to maintain such returns by continuance of such management were shown to survive his injuries. The policy provision in question is offered primarily as security against loss of earning power. We should scarcely feel justified in treating it as indemnity against loss of returns on investments. Cf. Medlinsky v. Metropolitan Life Ins. Co., 146 Misc. 855, 263 N.Y.S. 179; Pacific Mutual Life Ins. Co. v. McCrary, 161 Tenn. 389, 32 S.W.(2d) 1052; Kane v. Metropolitan Life Ins. Co., 228 Mo.App. 649, 73 S.W.(2d) 826.

■ The challenge under another claim of error to sufficiency of the evidence to sustain burden resting on plaintiff to establish presumable permanency of his injury is largely disposed of by what we have said. We need only add that under the policy provisions in question it is quite plain that recovery may be had for total temporary disability where it has continued for three consecutive months, immediately preceding receipt of proof thereof, for then it becomes presumably permanent in character. See New York Life Ins. Co. v. Gunn, 253 Ky. 596, 69 S.W.(2d) 1018; Mutual Life Ins. Co. v. Wheatley, 243 Ky. 69, 47 S.W.(2d) 961; Perlman v. New York Life Ins. Co., 234 App.Div. 349, 254 N.Y.S. 646.

Complaint is also made of certain of the instructions. We have read and considered the instructions and the objections urged against them. We are satisfied that the policy provisions in question were fairly interpreted to the jury by the trial court.

Two cases chiefly relied upon by the defendant should be noticed. They are Coad v. Travelers' Ins. Co., 61 Neb. 563, 85 N. W. 558, and Pannone v. John Hancock Mutual Life Ins. Co., 52 R.I. 95, 157 A. 876.

In the Coad Case the insured's occupation was given as that of "capitalist." He suffered an injury to the back of his left hand by the bursting of a bottle, described by his physician as "a slight laceration, * * * an inch and a half back of the

knuckle of the first finger. * * * I think it was probably about a quarter of an inch (across). It went through the skin, and, as I remember it, through the outside of this tendon (of the first finger)." The injury produced an inability to extend or flex the fingers of his left hand. The accident policy sued on indemnified plaintiff against injuries through accident which should "independently of all other causes, immediately and wholly disable him from transacting any and every kind of business pertaining to his occupation." Summing up the testimony the court said: "While the plaintiff testifies to his disabilities from the accident, he does not testify to facts upon which to base an inference that he was prevented from performing any of the more important duties or work pertaining to his business or occupation as a capitalist."

Therein does the Coad Case differ from the case at bar. As we have held, the testimony of the plaintiff and his witnesses in the case at bar, if believed, will support such an inference as the Nebraska court held would be without foundation in the testimony in the Coad Case.

In the Pannone Case the insured was owner and proprietor of a market and grocery. The policy carried provisions for disability benefits. Insured's hands became swollen, probably due to the handling of frozen meats, and his fingers flexed with great difficulty. He sought recovery under the disability benefit clause of his policy.

A judgment of the trial court, sitting without a jury, in plaintiff's favor was reversed by the Supreme Court of Rhode Island. Referring to this case in Cantor v. Metropolitan Life Ins. Co., supra, the Superior Court of Pennsylvania said: "That [Pannone] Case, which was chiefly relied upon by appellant in its argument, was very different in its facts from this one. There the insured, who was the proprietor of a meat and grocery store, had a swelling of the hands which for some months—he had fully recovered at the time of the trial—prevented his handling frozen meats, but his activities in and around his store were not otherwise circumscribed. He visited it whenever he went out walking, and generally supervised the business, especially the financial part of it. The cash receipts were turned over to him each night, and he himself deposited them in his checking account in bank."

What we have said regarding the Coad Case applies to this case. Within the evidence and permissible inferences to be drawn therefrom is to be found a disability greater in extent than that disclosed in the Pannone Case.

On somewhat variant facts the same conclusion was reached in the following cases as in the Coad and Pannone decisions: Knapp v. Preferred Mutual Accident Asso., 53 Hun, 84, 6 N.Y.S. 57; McKinley v. Bankers' Accident Ins. Co., 106 Iowa, 81, 75 N.W. 670; Saveland v. Fidelity & Casualty Co., 67 Wis. 174, 30 N.

W. 237, 58 Am.Rep. 863; Shirts v. Phoenix Acc. & Sick Ben. Ass'n, 135 Mich. 439, 97 N.W. 966.

The following authorities, some with facts rather analogous to those of the case at bar, support the conclusion we have reached: Medlinsky v. Metropolitan Life Ins. Co., 146 Misc. 855, 263 N.Y.S. 179; Marshall v. K. C. Life Ins. Co., 171 S.C. 321, 172 S.E. 504; McCutchen v. Pacific Mutual Life Ins. Co., 153 S.C. 401, 151 S.E. 67; Equitable Life Assur. Soc. v. Serio, 155 Miss. 515, 124 So. 485; James v. U. S. Casualty Co., 113 Mo.App. 622, 88 S.W. 125; Laupheimer v. Massachusetts Mutual Life Ins. Co., 224 Mo.App. 1018, 24 S.W.(2d) 1058; Lobdill v. Laboring Men's Mutual Aid Assoc., 69 Minn. 14, 71 N.W. 696, 38 L.R.A. 537, 65 Am.St.Rep. 542; Commercial Travelers' Ins. Co. v. Springsteen, 23 Ind.App. 657, 55 N.E. 973; Aetna Life Ins. Co. v. Spencer, 182 Ark. 496, 32 S.W.(2d) 310.

■ The last point urged is a claim of error in allowing recovery to the time of trial. Plaintiff's injury occurred on April 18, 1933. Proof of disability was received by defendant on July 15, thereafter. Suit was filed December 2, 1933, trial followed on May 12, 1934, and judgment was entered on July 2, next following. Although three full months had not elapsed when proof was received, only three days were wanting to make it so. No point is made of this fact, the plaintiff's complaint alleging, and defendant's answer admitting, that proof was furnished after the lapse of ninety days following injury, and accepted without further request for additional proof; the defendant later denying liability.

Before finishing with his first witness, counsel for plaintiff asked and had leave for a trial amendment of his complaint by claiming disability benefits down to the time of trial, and as well for a recovery of a semiannual premium paid on or about December 11, 1933. One provision of the disability clause carried an agreement to waive premiums falling due after approval of proof of disability and to refund the same, if paid. No objection went to the form of the amendment; that is to say, it was not objected that it was by trial amendment of the original complaint rather than by supplemental complaint. The trial court in his instructions, and without objection, made issuable plaintiff's condition down to the time of trial, pursuant to the amendment. Hence we consider it not open to defendant to make this objection here.

The question arises whether the first monthly installment of disability benefit became payable on July 15, 1933, immediately on receipt of proof, when the disability became presumably permanent in character, or on August 15, a month later, after such presumably permanent disability had continued for that period. Cf. Mutual Life Ins. Co. v. Wheatley, supra; New York Life Ins. Co. v. Gunn, supra; Perlman v. New York Life Ins. Co., supra. Whether the one or the other date for beginning payments be taken, and the court without complaint took the earlier date,

makes a difference of $100 in the amount of the judgment. However, no point was made of this matter at the trial, and we do not consider it here.

It follows from what we have said that the judgment reviewed must be affirmed.

It is so ordered.

ZINN, J., concurs.

BRICE, J., did not participate.

BICKLEY, Justice (concurring specially).

The defendant company issued the policy in suit and doubtless many others of a like character after it was advised by many decisions of courts of last resort announcing the interpretation of the policy provision "total disability" as set forth by Chief Justice SADLER in the opinion prepared by him for the court. It had knowledge, therefore, that by reason of such adjudications, its policies, if they continued to issue them in the old form, would in all probability be accepted by some, and possibly many persons, upon the understanding that the company intended to, and did in fact, assume the correctness of such interpretations. If such was not its intention, its plain duty was to so modify the language of its policies as to make its purpose clear. I am unwilling to concede that an insurance company may continue to issue policies without any modification of their terms, after certain provisions thereof have been construed by several courts of the highest character and ability, and be heard to insist, in controversies between itself and the insured with respect to such subsequently issued policies, that they do not in fact cover risks which they have been judicially adjudged to cover before they were issued.

Such a view was expressed by Thayer, Circuit Judge, in Fidelity & Casualty Co. v. Lowenstein, 97 F. 19, 38 C.C.A. 29, 46 L.R.A. 450, and approved by this court in Buel v. Kansas City Life Ins. Co., 32 N. M. 34, 250 P. 635, 52 A.L.R. 367.

I therefore concur in the decision, irrespective of my view as to the soundness of the reasoning of the decisions construing the policy provision "total disability" in the manner set forth in the prevailing opinion.

HUDSPETH, Justice (dissenting).

The contract of insurance contains the following clause: "Total disability.—Disability shall be deemed to be total whenever the Insured is wholly disabled by bodily injury or disease so that he is prevented thereby from engaging in any occupation whatsoever for remuneration or profit." Under the so-called construction adopted by the majority, "total disability" means that the insured is "unable to do substantially all the material acts necessary to the conduct or prosecution of any occupation in substantially the usual and customary manner." And the result is that the appellee, who is conducting successfully his business yielding thousands of dollars annually in net profits, is adjudged "totally disabled" because he is no longer able to qualify as a roustabout in the lumber yard.

Insurance contracts should be liberally construed in favor of the insured, but that rule does not justify the writing of a new contract for the parties nor holding that white is 90 per cent. black. I believe it will be conceded that the management of a business of the magnitude of appellee's is ten times more essential and valuable than the physical labor of the strongest roustabout in the lumber yard. The theory of appellee's able counsel that this immigrant boy was not the architect of his own fortune, but owed his business success to his employees, was exploded by the appellee himself when he testified: "Yes, I watch everything. If I don't I go in the street." His English is broken, but his business philosophy is sound. This and other unequivocal admissions show that his brain makes the important decisions and that he manages his business.

He testified that he was an expert on lumber; that he was at his place of business every day; that if customers came in to buy he would talk to them and send them to the bookkeeper to get the figures; that he told the boys in the yard what to do; and further:

"Q. It is the best equipped and best run lumber business in town isn't it? A. That is what they say. That is correct.

"Q. You are modest to say it yourself. A. Not only in the town, in the State, I say that; am proud of it."

And as to his other properties he testified:

"Q. And you manage those properties and collect the rent? A. Well my bookkeeper collects the rent and I can look after the places.

"Q. She collects the money and you do the renting and see that the money is paid? A. Yes, sir.

"Q. Those properties that you own are residential and business property? A. Yes, sir.

"Q. And you have the renting and general supervision? A. Yes."

When a party's own testimony negatives his right of action, he has no right to have the case submitted to the jury. Madden v. Red Line Service (Mo.App.) 76 S.W.(2d) 435; Harlow v. Leclair, 82 N.H. 506, 136 A. 128, 131, 50 A.L.R. 973, and annotations.

In the last case cited the court said: "But, when a party testifies to facts in regard to which he has special knowledge, such as his own motives, purposes, or knowledge, or his reasons for acting as he did, the possibility that he may be honestly mistaken disappears. * * * Whether his statements be true or false, he will be bound by them, and possible contradictions by other witnesses become immaterial. He will not be allowed to obtain a judgment based on a finding that he has perjured himself."

The reason for the rule holding that the party to an action is bound by his own testimony as to facts peculiarly within his

own knowledge is that it would be manifestly unjust to allow him to prevail after he had clearly and unequivocally given sworn testimony destructive of his right of action or defense. King v. Spencer, 115 Conn. 201, 161 A. 103.

The theory that the appellee contributed only physical strength to the success of his business enterprises seems to me to be contradicted by his own unequivocal admissions, and I am unable to agree with the construction put upon the total disability clause of the insurance contract quoted above.

For the reasons stated, I therefore dissent.