244 P.2d 522

**KUTZ CANON OIL & GAS CO. et al. v. HARR et al.**

**McCARTHY v. MARTIN et al. (two cases).**

No. 5330.

Supreme Court of New Mexico.

April 16, 1952.

A. L. Vogl, and Whitehead & Vogl, all of Denever, Colo., G. W. R. Hoy, Farmington, R. P. Fullerton, Santa Fe, for appellants, Kutz Canon Oil & Gas Co., et al., and Cross-Appellees, Kutz Canon Oil & Gas Co., et al.

Keleher & McLeod, Albuquerque, for McCarthys.

Atwood, Malone & Campbell, Roswell, for appellant Fred Feasel.

Seth & Montgomery, Santa Fe, for Intervener, Stanolind Oil & Gas Co.

R. P. Fullerton, Santa Fe, for Interveners, Byrd–Frost, Inc. and Paul B. English.

SADLER, Justice.

This proceeding is one to review the final decree entered in consolidated causes numbered 02420, 02535 and 02542 on the civil docket of the district court of San Juan County. Cause No. 02420 was a suit to quiet title in which Kutz Canon Oil and Gas Company and Kutz Canon Deep Test, Inc., both Colorado corporations, were plaintiffs and Paul W. Harr, Transcal Gas and Oil Corporation and others were defendants as the complaint was originally filed and in which Fred Feasel was later added as a defendant. In cause No. 02535, Joseph P. Mc-Carthy, Executor of the Estate of John A. McCarthy, deceased, was plaintiff and Kutz Canon Oil and Gas Company, Kutz Canon Deep Test, Inc., Ray H. Martin and others were defendants, while in cause No. 02542, Alice McCarthy, Cecelia A. McCarthy and others, heirs at law of John A. McCarthy, deceased, were plaintiffs and Kutz Canon Deep Test, Inc., R. H. Martin and others were defendants.

Cause No. 02420 was an ordinary action to quiet title in plaintiffs, Kutz Canon Oil and Gas Company, hereafter for brevity designated Kutz Canon Company (Colo.) and Kutz Deep Test, Inc., likewise and for brevity hereinafter designated Deep Test, in and to rights under certain federal operating agreements and leases which plaintiffs claimed to have acquired on lands described in five operating agreements theretofore executed under and pursuant to a like number of government permits on lands in San Juan County, New Mexico. The plaintiffs in causes Nos. 02542 and 02535 claimed in one instance to be the executor of the estate of John A. McCarthy, deceased, and in the other instance to be the heirs at law of said decedent. In each of causes Nos. 02535 and 02542, the plaintiff or plaintiffs mentioned asserted ownership of interests in the estate sought to be quieted in plaintiffs in cause No. 02420 as well as asking for damages and an ac-

counting from such plaintiffs with respect thereto and other equitable relief.

The three causes, Nos. 02420, 02535 and 02542 were consolidated for purposes of trial. Prior to judgment there were several interventions including that of Stanolind Oil and Gas Company and others, appearing here as appellees. A trial lasting several days was had; the court made extensive findings of fact and conclusions of law and entered its decree defining and declaring the interests of the respective parties from which various appeals and cross-appeals have been prosecuted to this court to review the decree and on such review to affirm, modify or reverse it according to the divergent interests of the several parties. As may very well be assumed from what has just been said, we have here some three or four law suits in one with the various parties plaintiff, defendant and intervenors lining up for or against each other according to the manner in which their respective interests will best be served.

A reading of the briefs discloses three major conflicts in the record which consists of 14 volumes of transcript containing more than 2100 pages to which counsel have devoted more than 250 pages of briefing in presenting their respective points and arguments. The three major conflicts mentioned are (1) a controversy between the plaintiffs (appellants) and the McCarthys;

(2) a controversy between the plaintiffs and Fred Feasel, a defendant and cross-appellant; and (3) a controversy between certain intervenors and plaintiffs as appellees on the one side and the McCarthys and Feasel as appellants on the other. It will contribute to convenience of presentation and clarity of understanding, we think, if we first take up and dispose of the controversy between the plaintiffs and the McCarthys.

The first issue to be resolved in the case, then, is primarily one between the plaintiffs, Kutz Canon and Deep Test (with the parties claiming under them, of course, affected by the outcome) aligned on the one side, and Joseph P. McCarthy, as Executor of the Estate of John A. McCarthy, deceased, together with Alice McCarthy, Cecelia A. McCarthy and other named parties answering and cross-complaining with them as heirs at law of John A. McCarthy, deceased, aligned on the other side. Unless demanded in the interest of clarity, Joseph P. McCarthy, as executor aforesaid and the heirs of John A. McCarthy, deceased, are herein referred to simply as "the McCarthys."

The gravamen of the objection by plaintiffs to the decision and decree in so far as this issue is concerned is to be found in the trial court's findings of fact 22 and 23, its conclusion of law No. 6 and in so much of the final decree as extends a lien as security

for certain note later mentioned, plus interest for more than 20 years, to oil and gas leases known as the Day, Galt, Hargrave, Feasel and Davidson Leases, in favor of Joseph P. McCarthy, as executor aforesaid, and against the interests and title of the plaintiffs. The findings mentioned read as follows:

"22. That the Court has looked through the veil in passing on the operations and dealings of the Kutz Canon Oil & Gas Company (N.S.L.), a New Mexico Corporation; Kutz Canon Oil & Gas Co., a Colorado corporation; Meyer, Martin & Co., Inc., and Kutz Deep Test, Inc., a Colorado corporation, and finds that the estate of John A. McCarthy, deceased, is a creditor of the Kutz Canon Oil & Gas Co., a Colorado corporation, and Kutz Deep Test, Inc., a Colorado corporation, to the extent of $9999.94, together with interest thereon at the rate of 6% per annum, from February 1, 1928, until paid.

"23. That as a condition to quieting title herein the Estate of John A. McCarthy, Deceased, should have a lien on all the rights, title and interest of the Kutz Canon Oil and Gas Company, a Colorado corporation and Kutz Deep Test, Inc., a Colorado corporation, in and to the Operating Agreements on the Day, Hargrave, Galt and Davidson property until the debt of $9,999.94, plus interest due the Estate of John A.

McCarthy is fully paid and satisfied."
Conclusion of law No. 6, reads:

"That as a condition to the quieting of title hereinafter ordered, the plaintiffs, Kutz Canon Oil and Gas Company, a Colorado corporation, and Kutz Deep Test, Inc., a Colorado corporation, must do equity by paying to the Estate of John A. McCarthy, Deceased, the sum of $9,999.94, plus interest at the rate of 6% per annum from February 1st, 1928, and in the event of their failure so to do the said Estate of John A. McCarthy, Deceased, is hereby declared to have a lien on all of the rights, title and interest of the two said corporations in and to the Operating Agreements on the Day, Hargrave, Galt and Davidson property."

The portion of the decree mentioned reads:

"It Is Further Ordered, Adjudged and Decreed that the Executor of the estate of John A. McCarthy, Deceased, has a lien for Nine Thousand Nine Hundred Ninety-Nine and 94/100 ($9,-999.94), together with interest thereon at 6% per annum from February 1, 1928 against all the right, title and interest of the Kutz Canon Oil and Gas Company and Kutz Deep Test, Inc., in and to the Oil and Gas Leases known as the Day, Galt, Hargrave, Feasel and Davidson Leases involved in this cause and upon the payment of such sum to

the Executor of the estate of John A. McCarthy, deceased, or to the persons entitled to such sum, then in that event the Executor, devisees or heirs of John A. McCarthy, deceased, shall have no further right, title or interest in or to the premises heretofore described or any of them, except as to the extent of selection of 160 acres herein before set forth and upon the payment of the sum above set forth, together with interest thereon at 6% from date hereof;"

So much space in the briefs is devoted to an argument of the several points raised on the appeal and cross-appeal as they affect this controversy that it would unduly lengthen our opinion to endeavor even to state and give a mere cursory discussion of them. Hence, our treatment of the errors claimed and argued on the appeal in so far as it relates to the McCarthys and on their cross-appeal will be as limited as possible consistent with presenting the position of the parties on the major points involved. This is done in order the sooner to reach and pass upon what we deem the decisive questions as respects both the appeal and the cross-appeal.

In the first place, the plaintiffs say McCarthy never had any beneficial interest in the note in question; that he was a mere employee of Meyer, Martin & Co., on a fixed salary prior to organization of Kutz Canon of New Mexico and an employce of the latter on the same basis following its organization delegated to do the very thing for it, namely, acquire these operating agreements, that the McCarthys claim he did for himself. The trial court's findings 4 and 5 that he took these operating agreements as agent for Kutz Canon of N. M. and assigned them to it in February, 1929, as obligated to do, would seem to bear out this contention. We say this in spite of seeming conflict between findings 22 and 23 and findings 4 and 5.

The minutes of the organization meeting of Kutz Canon of N. M. unexplained support the McCarthys in their contention as to the *bona fide* purchase by John A. McCarthy of stock in the corporation just named in exchange for operating agreements on several thousand acres of land and sale of such stock by him to Meyer, Martin & Co., for which he took the latter's note in the sum of $9,999.94 with interest at six (6) per cent. per annum from February 1, 1928. The plaintiffs challenge vigorously in an extensive argument the claim that the amount evidenced by the note made the basis of the McCarthy claim ever existed as a *bona fide* indebtedness in favor of John McCarthy at all. They claim he advanced none of his own money to secure the operating agreements; that they were taken in his name as a matter of accommodation in the organization of the Kutz Canon of N. M. so they could be turned into the company to "full pay" the

stock issued in exchange for the 499,997 shares issued to him for the operating agreements at 2¢ per share; that as fast as Meyer, Martin & Co. sold the stock the money was transmitted through McCarthy to Kutz Canon of N. M. until the note was paid in full. So much for the contrary claims of the parties reflected by the evidence in this behalf.

At the very outset, the plaintiffs challenge the right of the trial court to consider the claim because said to be outside the pre-trial order, the terms of which are quoted in support of this contention. Counsel for the McCarthys meet this argument with authority both in texts and decided cases sustaining the right of the trial court to amend the pre-trial order (Rule 16 of the District Courts) in this particular "to prevent manifest injustice." They cite among other authorities 2 Pomeroy's Equity Jurisprudence (5th Ed.) 52, § 385; Merrifield v. Buckner, 41 N.M. 442, 70 P.2d 896; Dool v. First National Bank, 207 Cal. 347, 278 P. 233; and a case affirming the right to treat the pre-trial order as amended under certain conditions without formality of amending. Mayfield v. First National Bank, 6 Cir., 137 F. 2d 1013.

But whether terms of the pre-trial order foreclosed consideration by the trial court of the McCarthy claim based on the note mentioned, or whether there is substantial evidence to support the court"s findings 22

and 23 touching the indebtedness evidenced by the note, both are questions which we deem rendered immaterial by our conclusion that, even if the McCarthy claim that the note represented a bona fide indebtedness in favor of John A. McCarthy be accepted at face value, the trial court erred in imposing as security therefor a lien on the interests of the two Kutz companies named in the oil and gas leases involved for reasons next to follow.

Perhaps no question in the case was more hotly contested at the trial, and, certainly, none is more vigorously argued here than that which questions the right of the court to charge plaintiffs with liability on the Meyer, Martin & Co. note to McCarthy and secure it by a lien on the interests of the plaintiffs in the five operating agreements, or leases, involved. It is to be recalled, as finding No. 22 recites, that the trial court "looked through the veil" in passing upon the operations of the companies mentioned therein in ascertaining liability of property of the two plaintiff corporations, for satisfaction of the McCarthy note.

We must, then weigh for substantiality the evidence upon which the court rests this portion of its findings and decree. It consisted of evidence that Meyer and Martin, as individuals, promoted organization of Kutz Canon of N. M. of which Martin became a director and that Meyer,

Martin & Co. put up all the money for incorporation of the company. Then this additional evidence: Meyer, Martin & Co. was a stock brokerage concern, incorporated in Colorado in 1927 and was dissolved in 1940. It was owned entirely by A. G. Meyer and Ray Martin. It employed John A. McCarthy, in connection with procuring the operating agreements, according to Martin, who made a special trip from Denver to Farmington to ascertain whether McCarthy had actually assigned the operating agreements to Kutz Canon of New Mexico.

At time of trial, Meyer was President of Kutz Canon of Colorado and Martin, the Secretary. Martin testified that through the efforts of Meyer, Martin Company, something like a half million dollars was expended in connection with development of the leases involved in these consolidated cases. Meyer, Martin Company actually controlled Kutz Canon of New Mexico, according to Martin, all of whose assets were sold to Kutz Canon of Colorado which assumed all the liabilities of the seller corporation. In addition, there was testimony that Meyer and Martin, his partner, themselves took over all the assets and stock of Meyer, Martin and Company.

Apparently the trial judge became convinced that the foregoing afforded evidence of finagling or gerrymandering of the corporate assets of the various companies named, in which Meyer and Martin, or Meyer, Martin Company owned by them, were the principal movants and factors; that such evidence warranted a denial to plaintiffs of the relief prayed against the McCarthys as to the leases involved unless coincident with granting same the plaintiffs' interests therein were subjected to payment of this unsatisfied obligation of Meyer, Martin and Company, the prime mover in the whole transaction. There was some evidence that Meyer, Martin and Company was in actual control of Kutz Canon of New Mexico and later of Kutz Canon of Colorado, and we may assume for purposes of this decision of Kutz Deep Test, Inc., though no evidence of that fact has been called to our attention. There it is and it is all of the evidence pointed out to support the imposition of this lien on property of the plaintiffs.

It thus is clear that the findings relied upon to sustain the assessment of liability against the plaintiff corporations, Kutz Canon Oil and Gas Company and Kutz Deep Test, Inc., both Colorado Corporations, do not have the needed support in the evidence. Neither corporation ever signed or endorsed the note in question, nor does the evidence support the inference that either corporation is an alter ego of Meyer, Martin Company, or wholly owned by Meyer and Martin, individually, as the sole distributees of Meyer, Martin Company upon its dissolution. We simply start out with a note of Meyer, Martin Company

for approximately $10,000 and wind up with liability thereon imposed on two entirely separate and distinct corporations, neither of which ever promised or agreed to pay the same.

There is an obvious omission of material facts indispensable to liability of property of the plaintiff corporations, even though imposed provisionally, as a condition to granting them the equitable relief of quieting title to the leases involved. As already stated, neither corporation is shown to be an alter ego of the dissolved maker of the note in question, Meyer, Martin and Company. Even if granted that during its corporate existence it owned stock in Kutz Canon of New Mexico, Kutz Canon of Colorado, or Kutz Deep Test, the latter two companies being plaintiffs herein; or, that Meyer, Martin and Company, owned a majority or even a controlling share of the stock in all or any of the Kutz companies (and there is no evidence to sustain such an assumption), that fact would give the trial court no right to impose a lien on property of such companies which have other shareholders scattered throughout the country who hold in ownership shares of their stock.

There is authority for the proposition that where corporate entity is employed as a shield to defraud creditors or otherwise perpetrate frauds, the veil of corporate existence will be drawn aside

and liability imposed on its stockholders as though there were no corporate existence. See article in 12 Columbia Law Review 496; State Trust & Savings Bank v. Hermosa Land and Cattle Company, 30 N.M. 566, 240 P. 469; Owl Fumigating Corp. v. California Cyanide Co., D.C., 24 F.2d 718; Id. 3 Cir., 30 F.2d 812. The first paragraph of the syllabi to above mentioned New Mexico case, prepared by the court, reads:

"Circumstances of a case may sometimes require a court of equity to ignore the separate entity of a corporation, and to look to the *sole owner* of its capital stock as the real party in interest." (Emphasis ours.)

There is here no showing that Meyer, Martin & Co., was sole owner of the stock of either plaintiff corporation and, on the contrary, the evidence disclosed that there were thousands of shares in other ownership throughout the country. The McCarthys have failed to point out to us any authority, that would justify the imposition of a lien, even though provisional only, on the property of plaintiff corporations in which there are other shareholders in addition to the maker of the note they hold and seek to collect as is the case here. The trial court erred in finding the estate of John A. McCarthy is a creditor of the plaintiffs and in imposing a lien on their interests in the five operating agreements (leases) as security therefor.

We come next to the cross-appeal of the McCarthys in which they complain of the failure of the trial court to quiet title in them to the five leases involved. It will be recalled that the operating agreements out of which the leases mentioned arose all originally stood in the name of John A. McCarthy and subsequently, as found by the trial court, were transferred by him to Kutz Canon of New Mexico and by it to Kutz Canon of Colorado, one of the plaintiffs. While forty-seven (47) errors are assigned on their cross-appeal, they are argued by counsel for the McCarthys under three points, the last of which unless well taken, and we think it is not, proves decisive and will render unnecessary consideration of the other two.

Point III reads, as follows:

"The court erred in finding that the decree in suit No. 01674, District Court of San Juan County had any force or effect."

At the trial, the plaintiffs introduced in evidence as their Exhibit 1 the entire record of a suit filed in the district court of San Juan County, New Mexico, on June 25, 1937, wherein Kutz Canon Oil and Gas Company (New Mexico) and certain individuals were plaintiffs and J. A. McCarthy, if living, and the unknown heirs of J. A. McCarthy, if deceased, were defendants, numbered 01674 on the civil docket of said court. The object of said suit was to quiet the title of plaintiffs as against the defendants and set at rest the rights of plaintiffs in said suit under the five operating agreements here involved in the lands described therein. Judgment was entered in favor of plaintiffs on September 27, 1937, and it is that judgment that is pleaded in bar of the McCarthys' right to the relief of a decree quieting title in them to the five leases which eventuated from said operating agreements.

The decree does no more than confirm in the plaintiffs in that suit the rights transferred by John A. McCarthy to Kutz Canon of New Mexico, by the assignments found to have been executed by him in favor of Kutz Canon of New Mexico in the court's findings of fact Nos. 4 and 5. Certainly, it is effective, if valid, to cut off all claims now made by the McCarthys in and to the premises involved, save the right of selection as to 160 acres of the lands in said suit reserved to the defendant therein, J. A. McCarthy, in the last paragraph of said decree, subject to the conditions therein set forth. And, by the same token, if valid, said decree cuts off all rights and interests of the defendant herein, Fred Feasel, in and to any of the premises described in said decree in so far as he asserts them under a certain quit claim deed or other conveyance from the heirs of John A. McCarthy.

It is insisted by counsel for the McCarthys that the decree in cause No.

01674 is void because the record of that case discloses an absence of the signature of the county clerk to the jurat on the complaint as well as the lack of an affidavit of mailing of the summons and copy of the complaint to McCarthy. Actually, the court found on adequate proof that a copy of the summons and complaint were duly mailed to defendant, McCarthy, and the attorney for plaintiff in the suit testified that he actually verified the complaint therein before the county clerk. But however that may be, this was a collateral attack on the judgment in cause No. 06174, and it was not open to the McCarthys to void the decree on the defects claimed in the face of the recital in the decree that due service was made and the absence of an affirmative showing in the judgment roll to the contrary. 34 C.J. 537, § 841 and 49 C.J. S., § 425, page 831, under topic Judgments; Vanfleet's Collateral Attack 471, § 468; State v. Patten, 41 N.M. 395, 69 P. 2d 931; Ware v. Farmers' Nat. Bank, 37 N.M. 415, 24 P.2d 269; McKenzie v. Donnell, 151 Mo. 431, 52 S.W. 214; White v. White, 142 Tex. 499, 179 S.W.2d 503; Davis v. Tuggle's Adm'r, 297 Ky. 376, 178 S.W.2d 979.

In 49 C.J.S., Judgments, § 425, page 834, the author of the text, touching this subject, states:

"It will be presumed, as against a collateral attack, that the court had jurisdiction of the subject matter and of the persons or parties, and that all the facts necessary to give the court jurisdiction or power to render the particular judgment existed, and were duly proved and found, unless the fact of want of jurisdiction, and consequent invalidity of the judgment, affirmatively appears on the face of the judgment, or of the judgment roll or record, or is made to appear in some other permissible manner."

We come next to the controversy between the plaintiffs, Kutz Canon Oil and Gas Company and Kutz Deep Test, Inc., both Colorado corporations, on the one hand, and the defendant Fred Feasel on the other. Although the three causes Nos. 02420, 02535 and 02542 were consolidated for trial, the two last mentioned having been consolidated with cause No. 02420, the defendant Feasel disclaims any interest in any one of the three suits mentioned except cause No. 02420. As already shown there were five prospecting permits involved, known as the Day, Feasel, Hargrave, Davidson and Galt, as to each of which J. A. McCarthy secured an operating agreement. It is only that between him and Fred Feasel with which we are now concerned.

Under date of April 24, 1924, a prospecting permit was issued to Feasel under Santa Fe Serial No. 046563 on certain lands described therein in San Juan County, New Mexico, containing 2522.6

acres of land. On March 2, 1928, he entered into a contract with J. A. McCarthy, known as an operating agreement under the terms of which McCarthy and his assigns were to perform the conditions of the permit and keep the same in good standing and in the event of a discovery of oil or gas to receive 7½ per cent. of the production of either from so much of the permit lands as might be included in a lease from the government at 5 per cent. royalty.

Exchange and preference leases were successively issued to Feasel based on the prospecting permit and operating agreement. The plaintiffs and intervenors, Stanolind Oil and Gas Company, a corporation, Byrd Frost, Inc., a corporation, and Paul B. English in cause No. 02420, claimed interests in the Feasel operating agreement and leases as successors in title of J. A. McCarthy. Feasel disputed these claims of interest and asserted sole ownership of the lease standing in his name, freed of any claim on the part of the plaintiffs and intervenors. The court made numerous findings touching the disputed claims, in nearly all of which the Feasel permit is treated along with the other four prospecting permits and operating agreements. Hence, it will be necessary to mention them in quoting such findings, although we are now concerned only with the Feasel permit and operating

agreement. So far as material to present discussion the findings read:

"3. That on or about the following respective named dates, J. A. McCarthy, now deceased, made and entered into certain Operating Agreements with the several following named five respective persons for drilling, prospecting, operating, producing, and marketing of oil and gas in, on, under, and from the lands of the public domain of the United States hereinafter described, namely:

\*    \*    \*    \*    \*    \*

"(b) Operating Agreement, dated March 2nd, 1928, and Supplemental Agreement thereto, dated August 24th, 1929, between J. A. McCarthy and Fred Feasel, of Albuquerque, New Mexico, covering the following described lands then held by said Fred Feasel under Oil and Gas Prospecting Permit issued by the Department of the Interior of the United States under Sante Fe Land Office, Serial No. 046563, to-wit:

"'All of Sections thirty-two (32), thirty-three (33), and thirty-four (34), all in Township Twenty-eight (28) North, of Range ten (10) West, N.M.P.M., and the West Half (W½), the South Half of the Northeast Quarter (S½NE¼), and the Southeast Quarter (SE¼) of Section two (2), and Lot One (1) of Section three

(3), all in Township twenty-seven (27) North, of Range ten (10) West, N.M.P.M., containing 2522.6 acres, more or less.'

which said Operating Agreement is recorded in Book 84, at page 747, and which said Supplemental Agreement is recorded in Book 126 at page 259, of the public records in the office of the County Clerk and Recorder of San Juan County, New Mexico, a copy of which Operating Agreement was introduced in evidence herein as a part of Defendant McCarthy's Exhibit 2, and a copy of which said Supplemental Agreement was introduced in evidence herein as Plaintiffs'. Exhibit 3, and which Operating Agreement was made a part of the Complaint in Cause No. 01674.

\* \* \* \* \* \*

"4. That at the respective times said J. A. McCarthy entered into the five Operating Agreements hereinabove referred to, he was an employee and agent of the Kutz Canon Oil and Gas Company (No Stockholders' Liability), a New Mexico corporation, and entered into said Operating Agreements for the sole use and benefit of said corporation and with the understanding that he would thereafter assign said Operating Agreements to said corporation or to such person as it might designate.

"5. That in the month of February, 1929, the said J. A. McCarthy, in conformity with the conditions under which he obtained the foregoing five Operating Agreements, and as he was in equity bound to do, assigned, or attempted to assign, said five Operating Agreements to the Kutz Canon Oil and Gas Company (No Stockholders' Liability), a New Mexico corporation.

\* \* \* \* \* \*

"12. That on January 3rd, 1938, Kutz Canon Oil and Gas Company (No Stockholders' Liability), a New Mexico corporation, sold, assigned and conveyed all of its property, real, personal and mixed, including all its rights, title and interest in and to the Operating Agreements involved in this Cause to Kutz Canon Oil and Gas Company, a Colorado corporation, one of the Plaintiffs herein.

\* \* \* \* \* \*

"17. That the Department of the Interior issued to Fred Feasel an Exchange Lease, Santa Fe Serial No. 046563, in exchange for his Prospecting Permit hereinabove referred to, and bearing the same Serial number, and including all the lands embraced in said Prospecting Permit, hereinabove described; that subsequent to the execution of said Operating Agreement between Fred Feasel and J. A. Mc-

Carthy and its assignment as above set out, numerous extensions of the Prospecting Permit held by said Feasel were secured by Plaintiffs with the knowledge and approval of said Feasel, and all applications were prepared by Plaintiffs and signed by said Feasel; that said Prospecting Permit was kept in full force and effect by reason of the acts of the Plaintiffs and their predecessors in interest; that in order to protect the rights of said Feasel, the Exchange Lease under which he now holds was procured by the Kutz Canon Oil and Gas Company, and the bond required in connection with said Lease was likewise furnished by said Plaintiff at the request of said Feasel; that at no time did the Kutz Canon Oil and Gas Company or its predecessor abandon its rights under the Operating Agreement executed by said Feasel, and at no time did said Feasel serve on said Plaintiff or any other person the notice of forfeiture required by said Operating Agreement executed to said McCarthy; that said Feasel at all times recognized said Operating Agreement and Plaintiffs' ownership thereof; that the Operating Agreement between said Feasel and said J. A. McCarthy carried over to the Exchange Lease obtained by said Feasel and carries over to all the future Leases into which said Exchange Lease may be merged.

"18. That by reason of amendments to the Federal Oil and Gas Leasing Act, and the acceptance by said Feasel of the Exchange Lease covering his earlier Prospecting Permit, there is no portion of the lands embraced in said instrument on which a Lease carrying a royalty of less than 12½% may be obtained; that by reason of the change of policy of the Department and the impossibility of carrying out the original Operating Agreement between Fred Feasel and J. A. McCarthy in strict accordance with its terms, this Court will protect the rights of said Feasel and do equity.

"19. That the offer of Kutz Canon Oil and Gas Company, one of the Plaintiffs, Byrd-Frost, Inc., Stanolind Oil and Gas Company, Western Gas Company, and Paul B. English and wife, heretofore filed herein, offering said Fred Feasel a 7½ per cent royalty on one-fourth of the land embraced in his Lease No. 046563, does substantial equity and gives said Fred Feasel substantially the rights he would get if it were possible to obtain a lease from the Government carrying only 5 per cent royalty; and, pursuant to said offer, said Fred Feasel is entitled to an overriding royalty of 7½% per cent of all the oil and gas produced, saved and marketed from the following described lands, to-wit:

" 'The Northeast Quarter (NE¼), the East Half of the Southeast Quarter (E½SE¼), the Northwest Quarter of the Southeast Quarter (NW¼ SE¼), the North Half of the Southwest Quarter of the Southeast Quarter N½SW¼SE¼), and the Southeast Quarter of the Southwest Quarter of the Southeast Quarter (SE¼SW¼ SE¼) of Section Thirty-Two (32), and the West Half (W½) of Section Thirty-Three (33), Township Twenty-Eight (28) North, Range Ten (10) West, San Juan County, New Mexico, embracing 630 acres more or less.' "

From the foregoing findings of fact the court deduced conclusions of law affecting the Feasel operating agreement and lease, as follows:

"1. That the Court has jurisdiction of the parties and of the subject matter.

"2. That the Operating Agreements between J. A. McCarthy and the various permittees referred to in the foregoing Findings are not invalid by reason of the lack of approval by the Department of the Interior.

"3. That said original Operating Agreements carried over and covered the Exchange Leases of the Defendant, Fred Feasel, and other permittees as set out in the foregoing Findings, and apply to any other Leases or rights acquired by virtue of the existence of the Exchange Leases."

The court entered a decree in so far as the Feasel interests are concerned in conformity with the findings and conclusions which we have quoted and on his appeal therefrom the defendant, Feasel, as appellant seeks to secure a reversal of the decree and entry of one in his favor on all disputed points.

The decree in paragraph I adjudged the plaintiff, Kutz Canon Oil and Gas Company, a Colorado corporation, to be owner of the operating agreement between J. A. McCarthy and the defendant, Feasel, on the lands described in finding of fact 3(b) quoted above and again described in paragraph I(b) of the decree which lands were further described as those embraced in an exchange lease issued by United States to Fred Feasel, under Serial Santa Fe 046563, all located in San Juan County, New Mexico, the interest described being declared subject to certain defined royalties on specified lands in favor of named persons as well as subject to certain selections of 160 acres in favor of named persons. The decree further made the interest of the plaintiff, Kutz Canon Company, named above, subject to all royalty payments due and payable to the United States and specifically reserved to Feasel the royalty specified in the offer to do equity filed by intervenors, Stanolind Oil and Gas Company, Byrd-Frost, Inc., and others, and referred to in the findings filed in the case, the language

of the decree making this reservation being as follows, to-wit: ·

"The interest described in the foregoing subdivision (b) hereof being subject to the royalty specified in the offer to do equity filed by Stanolind Oil and Gas Company, Byrd-Frost, Inc. and others, and referred to in the Findings filed herein."

While counsel for the defendant, Feasel, attack vigorously sufficiency of the evidence to support the material findings upon which the decree against him in plaintiffs' favor is based, a careful review of it satisfies us it meets the requirements of substantiality even if as to certain elements of proof it leaves something to be desired. But even where that be true and conditions and inconsistencies are to be found in the evidence and testimony of the party in whose favor the findings are made, nevertheless, unless they are of such a nature as to render the facts relied on inherently improbable, Roberson v. Bondurant, 41 N.M. 638, 73 P.2d 321; Ham v. Ellis, 42 N.M. 241, 76 P.2d 952, it is for the fact finder to weigh and, where possible, reconcile and characterize contradictions and inconsistencies in the testimony and finally say where the truth lies. Bubany v. New York Life Ins. Co., 39 N.M. 560, 51 P.2d 864. The mere fact that we might have viewed the facts differently does not license us to overturn them, if to be deemed resting on substantial evidence. Marchbanks v. McCullough, 47 N.M. 13, 132 P. 2d 426.

So viewing the facts, we begin a consideration of the controversy between the plaintiffs and Feasel with the finding that he entered into the operating agreement with J. A. McCarthy, an employee of Kutz Canon of New Mexico, acting for it and for its sole use and benefit and that he subsequently assigned same along with the four other operating agreements to Kutz Canon of New Mexico, the predecessor in title and interest of Kutz Canon Oil and Gas Company, a Colorado corporation, one of the plaintiffs in this suit, as in equity he was bound to do; that subsequently the Department of the Interior issued to Feasel an exchange lease for the Feasel prospecting permit on all the lands embraced in such permit; that plaintiffs and their predecessors in interest with Feasel's knowledge and approval kept the prospecting permit in full force and effect over a long period of time and in protection of his interests, as well as their own, actually procured the exchange lease under which he now holds. Then, the further finding that the operating agreement between Feasel and McCarthy carried over to the exchange lease obtained by Feasel and carries over to all future leases into which said exchange lease may be merged.

It is mainly over the situation resulting from finding No. 18 that the controversy between Feasel and the plaintiffs centers.

It is to be recalled, as pointed out by counsel that Feasel's prospecting permit was issued under the federal leasing act of February 25, 1920, 30 U.S.C.A. § 181 et seq. It was the permit so issued under which McCarthy entered into the operating agreement with Feasel. The act of August 21, 1935, 49 Stat. 674, 675, amending sections 13, 14 and 17 of the original leasing act of February 25, 1920, contained a provision that nothing herein should affect the validity of oil and gas prospecting permits previously issued under the 1920 act adding, however, that no such permit should be extended beyond December 31, 1938. The amendatory act of 1935 then provided in section 13 thereof for the exchange lease in the following language, to-wit:

"Provided further, that any person holding a permit to prospect for oil or gas which shall not be subject to cancelation for violation of law or operating regulations or which shall have been extended under the authority of this or any other Act, in force on or after the effective date of this amendatory Act, or for which timely and acceptable application for extension shall have been filed prior to said date, shall have the right prior to the termination of such permit to exchange the same for a lease to the area described in the permit without proof of discovery, at a royalty of not less than 12½ per centum or value of the production,

to be determined by the Secretary of the Interior by general rule and under such other conditions as are fixed in section 17 of this Act: Provided further, That no such lease shall be subject to the acreage limitations of section 27 of this Act, as amended, until one year after the discovery of valuable deposits of oil or gas thereon".

Reference to the terms of the operating agreement discloses that it provides, in event of discovery of oil or gas, for an overriding royalty of 7½ per cent. of the production of either from so much of the permit lands as might be included in a lease from the government at 5 per cent. royalty. The proviso in section 13 of the 1935 act granted permittees under the earlier leasing act, in the event of timely application therefor prior to the termination of such permit, to exchange same for a lease on the area described in the permit without proof of discovery "at a royalty of not less than 12½ per centum or value of the production, to be determined by the Secretary of the Interior by general rule" and under such conditions as are fixed in Section 17 of the act. In other words, no exchange lease could be secured carrying a royalty in favor of the government of less than 12½ per cent. of production as against the 5 per cent. government royalty applicable under the prospecting permit and operating agreement.

It is this discrepancy as to royalty which Feasel insists rendered the operating agreement impossible of performance by McCarthy and his assigns and thereby released him, Feasel, from all obligation to carry out any of its terms. Counsel for plaintiffs answer this claim of Feasel by pointing out that the prospecting permit which was admittedly in full force and effect on December 31, 1938, thereby entitling permittee to an exchange lease as a matter of course, had been kept in such condition by plaintiff and its predecessors, as found by the trial court; and that solely by reason thereof Feasel was able to apply for and obtain an exchange lease. They assert "it would be a startling proposition that plaintiff should be denied any right in the Exchange Lease after it kept the Permit alive for fourteen years and which Exchange Lease was issued as the direct result of Plaintiff's efforts in keeping up the Permit."

At this point it may be well to quote section 1 of the operating agreement. It reads:

"(1). The Permittee does by these presents employ the Operator for the aforesaid purposes, and as such employee, the Operator shall have, and is hereby given the exclusive right of possession of said described lands for the purposes herein specified, subject to the terms and conditions of said Permit *and of any and all leases which may be granted thereunder to the Permittee,*

and of all the laws, rules and regulations of the United States of America and the Department of the Interior and the United States Land Office pertaining thereto, together with the full and exclusive right, privilege and authority to enter upon; hold and explore said lands for the discovery, production, storage, removal; transportation and marketing of any and all oil and gas from; in, on, or under said lands, for the full term of said Permit, *and any and all extensions and renewals thereof, and any and all leases and extensions and renewals thereof issued to the Permittee,* subject to the approval of the Secretary of the Interior or his duly authorized agent or representative, and of the terms and conditions of this Agreement." (Emphasis ours).

Likewise and in view of fact that the Preference Right Lease is involved and referred to in some of the authorities later cited, we quote the statute providing for it, Act of July 29, 1942, 56 Stat. 726, as follows:

"Upon the expiration of the five-year term of any noncompetitive oil and gas lease issued pursuant to the provisions of the Act of August 21, 1935 (49 Stat. 674), amending [sections 185, 221, 223, and 226 of this title] and maintained in accordance with the applicable statutory requirements and regulations, the record title holder shall be entitled to a

preference right over others to a new lease for the same land pursuant to the provisions of section [226 of this title] and under such rules and regulations as are then in force, if he shall file an application therefor within ninety days prior to the date of the expiration of the lease. The preference right herein granted shall not apply to lands which on the date of the expiration of a lease are within the known geologic structure of a producing oil or gas field. * * * *"

It is strongly contended by counsel for Feasel that the finding above referred to and quoted, finding of fact No. 18, amounts to a finding of "impossibility of performance" of the Feasel-McCarthy operating agreement. Without requoting this finding, it is enough to say we disagree with this contention. It does recite that due to amendments of the federal oil and gas leasing act and the acceptance by Feasel of the exchange lease covering the earlier prospecting permit, there is no portion of the lands in said instrument on which a lease carrying a royalty of less than 12½% may be obtained and "that by reason of the change in policy of the Department and the impossibility of carrying out the original Operating Agreement between Fred Feasel and J. A. McCarthy *in strict accordance with its terms,* this court will protect the rights of said Fred Feasel and do equity." (Emphasis ours).

But in making the contention they do in this particular counsel would write a period after the word "impossibility" and delete what follows immediately, namely, "in strict accordance with its terms." That these qualifying words are not to be ignored is abundantly demonstrated by recognizing that if the operating agreement could be performed "in strict accordance with its terms" there would be no occasion for the court to protect Feasel's rights by "doing equity." Indeed, were such the case there would be no controversy between Feasel and plaintiffs.

It is in the finding immediately following No. 18, just discussed that the court sets forth its plan for "doing equity" by Fred Feasel in accepting the offer of Kutz Canon Oil and Gas Company, one of the plaintiffs, and Byrd-Frost, Inc., Stanolind Oil and Gas Company and Western Gas Company, on file in the cause, to give him a 7½ per cent. royalty on one-fourth of the land embraced in his lease No. 046563 (Santa Fe) which it is said does substantial equity by giving him substantially the rights he would get if it were possible to obtain a lease from the government carrying 5 per cent. royalty. The finding goes on to declare that pursuant to said offer Fred Feasel is entitled to a 7½ per cent. overriding royalty on 630 acres of described land to which in the decree the interests of all parties are made subject.

378

In this connection, it should be mentioned that the offer to do equity rested fundamentally on the change in the law doing away with any lease carrying only 5 per cent. royalty. In view of this fact, the parties mentioned tendered a selection of one-fourth of the acreage in the Feasel lease on which they agreed to pay him an overriding royalty of 7½ per cent. The selection tendered included the producing gas well drilled on the lease and, according to the uncontradicted testimony of an expert witness, whose qualifications as a geologist were unquestioned, it represented. a fair and equitable selection. It should not be forgotten that the operating agreement gave the operator (Kutz Canon) the right to make the selection of the acreage to be included in the lease carrying only 5 per cent. royalty and the original leasing law under which Feasel secured his prospecting permit provided that the 5 per cent. lease must include the discovery well and the lands contiguous thereto. The tendered offer to do equity complied with this condition of the law.

As already noted, the trial court found that the operating agreement between Feasel and McCarthy carried over to the exchange lease obtained by Feasel and carries over to all future leases into which the exchange lease may be merged. In view of the plain language of paragraph one (1) of the operating agreement quoted above expressly so providing we do not see how the trial court could have found otherwise. In the case of Blackner v. McDermott, 10 Cir., 176 F.2d 498, 501, a similar question arose as to whether an operating agreement under a lease carried over and applied to a preference lease into which the lease was transformed before its expiration. Blackner was the lessee and after controversy arose between him and McDermott, the other party to the operating agreement, both applied for renewal of the lease. But because of being the original lessee a new lease was issued to Blackner on the basis of his preferential right thereto as the original lessee. He then sought to repudiate any interest claimed therein by McDermott as a party to the operating agreement, the same contention here made by Feasel. The court ruled against Blackner's contention in the following language, to-wit:

"The further contention is that the operating agreement between McDermott and Blackner related only to the original lease and that it had no application whatever to the new lease granted to Blackner. It is argued that the words 'extension' and 'renewal' used in the operating agreement did not include the new lease subsequently issued to Blackner. But the contention leaves out of consideration the fact that the operating agreement provided in effect that the respective rights of the parties under it should extend throughout the term of the application,

the lease or leases, and any extension or renewal of the lease or leases. It may be that as between the United States and Blackner the second lease was a new one rather than an extension or renewal of the former lease. But that is not the test here. The test to be applied here is whether as between McDermott and Blackner the second lease was an extension or renewal of the first, within the intent and meaning of the original operating agreement. And in resolving that question, the language contained in the operating agreement, the relationship existing between the parties, and the background against which the agreement was drafted and entered into must be taken into consideration. Viewed in that manner, it is crystal clear that it was the mutual intention of the parties in entering into such agreement that their rights should continue throughout any lease which should issue as the outgrowth of their joint efforts then being exerted in connection with the preparation and filing of the original application, and otherwise. When all of the facts and circumstances are taken into consideration and given the weight to which they are entitled, it would unduly narrow the scope of the contract to construe it as having application only to the original lease, either during its primary period or during an extended or renewed period of it, but not to a subsequent lease to the same lessee which was the outgrowth of the joint efforts of the parties at the time of the filing of the application for the original lease and at the time of the issuance of such lease."

See, also, Aronow v. Bishop, 107 Mont. 317, 86 P.2d 644, 646, where apropos the same question, the court said:

"The permit is not extinguished by the granting of leases. It is the foundation for leases and, when granted to the permittee or his assignee, they merely constitute, in substance and effect, a continuation of rights granted by the permit but under different terms and conditions. Sec. 223, Title 30, U. S.C.A."

The somewhat recent decision of the Circuit Court of Appeals for the 10th Circuit in the case of Oldland v. Gray, 179 F. 2d 408, certiorari denied 339 U.S. 948, 70 S.Ct. 803, 94 L.Ed. 1362, represents a factual situation so similar and resolves several questions so like those presented on this appeal that we deem it quite persuasive on similar issues before us. The prospecting permit was one issued under the same federal leasing act as the Feasel permit. The assignment of it in 1926 was pursuant to an operating agreement seemingly bearing marked resemblance to the five operating agreements, including the Feasel,

with which we are here concerned. The permit was kept alive and in 1938 the assignee applied for and received an exchange lease under the act of August 21, 1935, portions of which we have quoted above. Within the five year term of the exchange lease, the original assignee transferred same to new assignees who themselves applied for a preference right lease under the act of 1942, a paragraph of which we have already quoted. The preference right lease was then assigned to Phillips Petroleum Company. It drilled and obtained production and having done so set up the claim that the provisions of the operating agreement entered into by the original permittee did not extend either to the exchange lease or the preference right lease. The contention was denied and among other things touching this phase of the case, the court said [179 F.2d 413]:

"The 1935 Amendment to the 1920 Act expressly authorized the holder of a valid prospecting permit to 'exchange the same for a lease to the area described in the permit without proof of discovery, at a royalty of not less than 12½ per centum or value of the production * * *.' i. e. see Amendment to Sections 13, 14 and 17, 49 Stat. 674–676. And, the amendment also provided that 'Nothing contained [therein] shall be construed to affect the validity of oil and gas prospecting permits or leases previously issued un-der the authority of the said Act of February 25, 1920.' Sec. 2(b), 49 Stat. 679. The exchange lease was granted on the basis of the valid permit, and when in 1940 McLaughlin quitclaimed the lease to his daughter Levison, and Gray, he again acknowledged his obligation to the Oldland Group under the terms of the permit, and Levison and Gray took the exchange lease with full knowledge of this outstanding obligation.

"Before the expiration of the five year exchange lease, and in November 1943, Levison and Gray applied for a new lease covering the same area, based upon the preference rights granted to them by the Amendment of July 29, 1942, 56 Stat. 726. The lease was granted with the active aid and assistance of Phillips on January 1, 1944, and it was subsequently assigned to Phillips, subject to a graduated overriding royalty of from 2½ per cent to 4⅓ per cent, which Phillips agreed to pay Levison and Gray in addition to the statutory Government royalty. Phillips took the assignment of the new lease with knowledge of McLaughlin's obligations under the original assignment of the underlying prospecting permit. The trial court so found, and its findings are supported by documentary evidence.

"From these facts, the trial court first concluded that by its terms, the 1926 assignment created a fiducial relationship between McLaughlin, his heirs and assigns and the Oldland Group, which was not extinguished by subsequent assignments or legislation. On reconsideration, however, the court was of the view that the assignment did not create a fiducial relationship or raise a trust in favor of the assignors. We think its first impression was correct.

\* \* \* \* \* \*

"They were not tenants in common, joint adventurers or mining partners. But fiducial relationships, universally recognized in equity jurisprudence, do not depend upon nomenclature. The doctrine extends 'in all of its breadth and with all of its effects' to all persons who obtain legal title or possession of property in any manner so that he cannot equitably retain it against the rightful owner.

\* \* \* \* \* \*

"Making application of this doctrine, it has been held that the assignment of an oil and gas lease reserving an overriding royalty, and providing that such reservation shall apply to all renewals, extensions and modifications, creates a trusteeship in the assignee, his successors and assigns for oil produced from a subsequent lease. Probst

v. Hughes, supra. Similarly, it has been applied to the assignment of an oil and gas lease in consideration of an oil payment, with the provision that before relinquishing the lease, the assignee shall give the assignor thirty days' notice and on request reassign the same. In such circumstances a constructive trust has been raised, enforceable against the production of the oil from a lease obtained by the assignee after relinquishment of the original lease without the required notice to the assignor. Hivick v. Urschel, supra [171 Okl. 17, 40 P.2d 1077]; Vol. 3 Summers, Oil and Gas, Perm.Ed., § 554, p. 320."

The foregoing comment by the court seems pretty effectually to dispose of any contention that the prospecting permit and operating agreement did not carry over and become applicable to the exchange lease. Still further reading of the opinion demonstrates how other questions argued so vigorously on this appeal were also raised and ruled upon in the opinion of the Circuit Court of Appeals in Oldland v. Gray, supra. Take for instance the claim here made that the 1935 amendment to the leasing act, under which the Feasel permit was taken out, by reason of the change imposing a minimum 12½ per cent. royalty as against the 5 per cent. royalty permissible under the earlier act extinguished any fiducial relationship created by the assignment pursuant

to the operating agreement. The court held otherwise in this language, to-wit:

"It is contended, and the trial court finally held, that even though a fiducial relationship was created by the 1926 assignment, it was extinguished by the 1935 Amendment to the Leasing Act providing for exchange leases and a minimum royalty of 12½ per cent, or that it was certainly extinguished by the 1942 Amendment providing for new leases. It is clear, without doubt, that the 1935 Amendment did not extinguish the permit or abrogate the rights of the parties hereunder. Instead, it expressly recognized the permit and the rights of the parties. * * * It thus becomes plain that nothing in the 1935 or 1942 Amendments operated to extinguish the rights of the parties under the permit, and that they were preserved in all of their vitality in the leases on which oil was ultimately obtained by Phillips. See Arnow [Aronow] v. Bishop, 107 Mont. 317, 86 P.2d 644; Dougherty v. California Kettleman Oil Royalties, 9 Cal.2d 58, 69 P.2d 155; General Petroleum Corp. of California v. Dougherty, 9 Cir., 117 F.2d 529.

"But even though the subsequent legislation operated to extinguish the rights of the appellants as between them and the Government, it did not affect the right of the parties under the private contract. As we have said,

the rights of the parties here do not arise out of the federal act. They have their genesis in and derive their vitality from an agreement between the parties, which unless contrary to declared public policy, are enforceable in accordance with its terms and conditions and applicable law. See Blackner v. McDermott, 10 Cir., 176 F.2d 498."

The contention that any fiducial relationship existing by virtue of the issuance of exchange lease based on the Feasel permit and operating agreement had been extinguished by the Amendment of 1935 having been resolved by what has just been quoted from the opinion in Oldland v. Gray, the court then turns to another question raised there and here and argued with much vigor here, namely, in endeavoring to "do equity" to Feasel (in the case at bar) the court has rewritten the contract between the parties. The court very readily and persuasively disposes of that contention in the following language, to-wit:

"The parties now contend, and the trial court indicated, that to grant the relief sought by the appellants, the court must rewrite the contract. In that connection, it is pointed out that the permit contemplated 7½ per cent royalty on one-fourth of the permit area on which the royalty to the Government would be 5 per cent under Section 14 of the original Leasing Act, and 4 per cent royalty on three-fourths

of the permit area on which the Government royalty was payable on a graduated scale, depending upon production. It is said that since the 1935 and 1942 Amendments provide for a minimum Government royalty of 12½ per cent, it is not within the equitable power of the court to fashion a decree which will give effect to the contract between the parties, and at the same time comply with federal law. But flexibility is one of the virtues of equity. Certainly equity will not be denied or hampered because of the imposition of intervening legislation. By their contract, the parties provided for royalty of 4 per cent to the appellants on leases or permits providing for a 12½ per cent Government royalty.

"When McLaughlin applied for his exchange lease under the 1935 Amendment, he acknowledged his obligation to pay the original permittee 4 per cent on all oil produced under the lease. When in 1944 Phillips was negotiating for the acquisition of the lease, a Company representative expressed the view that there was an outstanding royalty of 4 per cent of the oil and 7½ per cent of the gas 'reserved to the original permittees.' Giving full force and effect, therefore, to the provisions of the 1935 and 1942 Amendments providing for a minimum Government royalty of 12½ per cent, as well as the understanding of the parties, especially the appellees, we hold that a trust relationship was created binding upon all parties in the chain of title; that such relationship was not extinguished by the 1935 or 1942 Amendments, and that in equity and good conscience, the appellants are entitled to an overriding royalty of 4 per cent of the oil and 7½ per cent of the gas produced, saved and sold from the leasehold estate, free and clear of cost, subject only to the Government royalty."

Upon remand following a reversal of the decree entered by the trial court in Oldland v. Gray, supra, judgment was entered pursuant to mandate, as the trial judge supposed. Whereupon, a still further appeal followed dealing mainly with an award of interest on the money judgment for royalties, a matter with which we are not here concerned. See Phillips Petroleum Co. v. Oldland, 10 Cir., 187 F.2d 780. Nevertheless, the court felt called upon to summarize its former holding on the first appeal. What it says affords support for the power of the trial judge, sitting as a chancellor in a court of equity where certain conditions obtain, to award substantial benefit of a contract to a litigant, if literal enforcement thereof may not be had. The language of the opinion also helps to explain what the trial judge here meant in finding of fact No. 18, when as a basis for protecting Feasel's rights by doing equity,

he referred to the "impossibility of carrying out the original operating agreement * * * in strict accordance with its terms." Speaking of its former opinion in Oldland v. Gray, the court said [187 F.2d 781]:

"It was these considerations which prompted us, in the exercise of our equitable discretion, to decline literal enforcement of the permit assignment, but instead to award the claimants the substantial benefit of it by impressing a constructive trust on the proceeds of 4 per cent. of the oil and 7½ per cent. of the gas produced from all of the leases within the original permit area, after the deduction of the government royalty, regardless of the percentage— whether 12½ per cent. or more. In sum, we reasoned that while the Oldlands' rights were rooted in the contract, they were nourished and vitalized by the flexible processes of equitable jurisprudence, and ought therefore to find justification in the conscience of the chancellor."

An extended review of a troublesome case leaves us of opinion that except in the particular pointed out as to the claim of interest by the McCarthys, the trial judge committed no reversible error and his judgment is entitled to affirmance. True enough, as pointed out both by counsel for the McCarthys and counsel for Feasel, if the testimony of certain witnesses on given items of evidence be isolated from the evidence as a whole, oral as well as documentary, the basis for overturning certain findings would seem unavoidable. We do not feel, however, that such a result is compelled where the trial court viewed the evidence as a whole, bearing in mind that as to some of these matters the witnesses were testifying from memory about events and transactions occurring twenty years earlier.

The record discloses that defendant, Feasel, paid three (3) years' rental on the exchange lease issued to him at $630.75 per annum which under terms of the operating agreement the plaintiffs as assignees thereof were obligated to pay and, indeed, endeavored to pay but he declined to permit them to do so. Doubtless in so refusing he feared he would compromise his position by permitting the proffered payment. At the trial plaintiffs renewed their offer to take care of these rentals and consented to have payments thereof secured (pending appeal) in the event they prevailed in their contentions as to the Feasel lands. Nevertheless, no provision was made in the decree as to the matter. It is nothing but right that there should be reimbursement to Feasel of the rentals so paid by him in the total sum of $1892.25. Accordingly, the affirmance of the decree in favor of Kutz Canon Oil and Gas Company and Kutz Deep Test, Inc., both Colorado corporations, in so far as it affects said corporations only, is sub-

ject to the condition that they deposit with the Clerk of this Court within fifteen (15) days after the filing of this opinion the sum of $1892.25, to be paid over by the Clerk to defendant, Feasel, when the judgment entered hereon becomes final. Cf. Gonzales v. Sharp & Fellows Contracting Co., 48 N.M. 528, 543, 153 P.2d 676.

. And for like considerations of equity, in view of the result announced and the insistence of defendant, Feasel, that the operating agreement, interpreted in the light of the "offer to do equity" described in finding No. 19 and approved by the court, cannot be performed under existing federal departmental regulations, effective July 1, 1942, as to overriding royalty, he is granted leave upon remand to apply to the trial court to make such equitable change therein by reducing the rate and increasing the acreage as may be found necessary to bring it within the governing federal regulations. The trial court by appropriate order may reserve jurisdiction of the cause to entertain and pass upon such an application, and shall have jurisdiction to make such other modifications in the decree with respect to title as may be agreed upon by the interested parties.

The judgment of the trial court will be affirmed save as to the McCarthy interests as to which it is reversed and the cause will be remanded with a direction to the trial court to set aside so much of the judgment as is in their favor and to enter a new judgment affirming the decree otherwise. The plaintiffs and intervenors shall recover their costs against the defendant and cross-complainant Feasel and the McCarthys as defendants and cross-complainants, to be taxed by the Clerk.

It is so ordered.

LUJAN, C. J., and McGHEE, COMPTON and COORS, JJ., concur.