328 P.2d 600

Bruce K. MATLOCK, Marshall & Winston Inc., a Corporation, Plaintiffs-Appellees,

v.

Ruby SOMERFORD, Defendant-Appellant.

No. 6256.

Supreme Court of New Mexico.

July 31, 1958.

Brown & Brainerd, Roswell, for appellant.

Schauer & Stiff, James T. Jennings, Roswell, for appellees.

FRED J. FEDERICI, District Judge.

Appellees filed a statutory quiet title suit in the lower court and appellant answered asserting several defenses and affirmatively sought to quiet title in herself. The lower court ruled in favor of appellees and appellant has taken this appeal.

The real property in controversy consists of an irregular but contiguous tract of dry grass land lying west of Dexter, New Mexico, with no improvements except a windmill, and at one time one or two old houses were on the land which were removed. This 640 acre tract is described as:

> SW¼ Section 13, NE¼
> N½S½ Section 14, NW¼
> Section 24, Township
> 13 South, Range 24
> East, N.M.P.M.

This was part of a 2,000 acre contiguous tract of land originally owned by one De-Witt Clarence Huntley. It is undisputed that the source of title common to both appellees and appellant is the said Huntley. On October 1, 1922, Huntley had executed a deed of trust to M. E. Singleton, Trustee, covering the acreage other than the 640 acre tract here involved at which time the tract here involved was subject to a previous mortgage which was later released. On May 1, 1926, the entire 2,000 acre tract was acquired by one John R. Hollis subject to the Singleton Deed of Trust which Hollis agreed to pay. On June 9, 1926, the same 2,000 acre tract was conveyed by Hollis and wife to one J. C. McQuerry and wife who executed a mortgage back to Hollis covering the entire 2,000 acres, comprising both immediately contiguous tracts, becoming a second lien on the 1360 acre tract and a first lien on the 640 acre tract here involved. On December 2, 1926 this mortgage was

assigned to one B. D. Loving without recourse. On October 5, 1927, the then owner McQuerry, joined by his wife, conveyed the entire 2,000 acres, comprising both tracts, to M. E. Somerford, which conveyance was subject to above Singleton deed of trust covering 1,360 acres and the Hollis mortgage covering the entire tract which had been assigned to Loving. Under this conveyance Somerford assumed payment of both the Deed of Trust and mortgage. Somerford is appellant's predecessor in title, being the surviving widow of Somerford.

On January 24, 1928 in Cause No. 6937 in the District Court of Chaves County, Singleton Trustee commenced an action to foreclose the Deed of Trust against all persons named above in the chain of title including M. E. Somerford. Personal service was not had on Somerford but service upon him was had constructively by publication and by mailing. The affidavit of nonresidence to support constructive service by publication recited that Somerford resided in Coleman, Texas.

The holder of the mortgage Loving as a party defendant on February 10, 1928 filed an "answer and cross-complaint". Under the allegations of the cross-complaint a separate foreclosure was asked on the 640 acre tract to satisfy the indebtedness. The record shows a certificate of mailing of copy of the answer and cross-complaint by Loving's attorney to "M. E. Somerford, Coleman, Texas," the place where the original affidavit for publication recited Somerford to be a resident. No appearance or other pleading was filed in that case on behalf of Somerford. On July 27, 1928, a certificate of default was entered by the clerk for Singleton Trustee but the record is silent as to a certificate of default for cross-complainant Loving.

On July 27, 1928, a final judgment and decree was entered granting personal judgment and decree in favor of Plaintiff Singleton Trustee against certain defendants not including Somerford. The same decree granted cross-complainant Loving personal judgment against McQuerry, decreeing the Deed of Trust a first lien on the 1360 acre tract and decreeing that the Hollis mortgage owned by Loving be foreclosed as a second lien on the 1,360 acre tract and a special Master was appointed to carry out the foreclosure sale. On the same date a separate decree of mortgage foreclosure was entered on behalf of cross-complainant Loving granting personal judgment against McQuerry and decreeing foreclosure of the mortgage covering the 640 acres here involved and a special Master was appointed to make the sale.

The Judgment entered in favor of Singleton Trustee has the following recitals pertinent hereto:

"This cause coming on to be heard * * * upon * * * motion * * * for a judgment by default against the defendants * * * M. E. Somerford, * *

and it appearing to the court from the affidavit for service by publication and the affidavit of publication and the affidavit of mailing filed herein, that the defendants, * * *, M. E. Somerford * * * were duly served by publication as required by law, * * * and it further appearing from the Clerk's Certificate of default filed herein on July 27, 1928, that none of the said defendants have filed their answer or other pleadings herein within the time required by law, and all of said defendants are in default and the court being fully advised in the premises, finds:

"1. That the court has jurisdiction of the subject matter and of the parties to this suit.

"2. That the defendants, * * *, M. E. Somerford, * * * are in default.

"Wherefore It Is Decreed, Ordered and Adjudged, that the defendants, * *, M. E. Somerford, * * * are in default, and the allegations of plaintiffs' complaint are taken as confessed against the said defendants and judgment by default is hereby entered in favor of the plaintiffs and against the said defendants."

The judgment entered in favor of cross-complainant Loving has the following recitals pertinent hereto:

"This cause coming on to be heard upon the motion of Lee R. York, attorney for B. D. Loving, defendant and cross-complainant in the above entitled cause for a judgment by default, and it appearing to the court from the affidavit of service herein that all of the above named defendants have been served with a copy of answer and cross-complaint filed herein by the defendant, B. D. Loving, by mailing a copy thereof to the plaintiff, and all of the said defendants, and it further appearing that more than thirty days have expired since the date of such service, and it further appearing from the certificate of default filed by the Clerk of the District Court of Chaves County, New Mexico, on the 27th day of July, 1928, that no answer or other pleading has been filed by any of the said defendants, and that all of the said defendants are in default and the court being fully advised in the premises, finds:

"1. That the plaintiff and all the defendants herein except the defendant B. D. Loving, have been served with a copy of the answer and cross-complaint of B. D. Loving by mailing a copy thereof to such plaintiff and defendants, and that none of the said defendants have filed any answer or other pleading in said cause, and that the defendants are in default.

" * * * it is decreed, ordered and adjudged that a judgment by default be entered in favor of the defendant B. D. Loving, and against the other defend-

ants herein, and that the allegations of his cross-complaint be taken as confessed.

"* * * this cause coming on for further hearing upon the motion of the cross-complainant, B. D. Loving for a judgment in favor of the said cross-complainant, B. D. Loving and against the other defendants herein, and the cross-complainant having submitted his evidence and the court being fully advised in the premises, finds: * * *".

The 1360 acre tract was sold to Singleton Trustee and the 640 acre tract was sold to Loving. The Special Master's Deed to the 640 acre tract is dated December 7, 1928. Then on April 1, 1929 an instrument designated "Release" was executed by Loving (not joined by his wife) in favor of Somerford, which instrument was the subject of much controversy in the court below, as well as it is in this court.

The aforementioned "Release" is in words and figures as follows:

"B. D. Loving
    to          Release
M. E. Somerford
Dated:         April 1st, 1929
Filed:          April 22nd, 1929
Recorded:     Book U of Satisfactions,
               page 245.
(58/207 and 2/269, Mrtg. and Assignment for reference only.)

"State of Texas,   ⎱
"County of Wichita ⎰

"Whereas, J. C. McQuerry and wife Minnie L. McQuerry, did on the 5th day of October, 1927, by deed of that date duly recorded in the records of deeds in Chaves County, New Mexico, Vol. 70 page 345, Grant, Sell and Convey to M. E. Somerford, the following described property, situated in Chaves County, New Mexico, to-wit:

"The SE¼ of Section 10; the SW¼ and the S½ of the SE¼ of Section 11 N½SW¼, SE¼SW¼, N½SW¼SW¼, of Section 12, S½ of Section 13, E½ and SW¼ of Section 14, SE¼ of Section 15, NE¼ of Section 23, N½ of Section 24, all in Twp. 13 South, Rge. 24 East, NMPM and E½SW¼SE¼ of Sec. 7 in Twp. 13 South, Rge. 25 East, N.M.P.M. Containing 2000 acres according to the Government survey thereof,

"And Whereas, as part of the consideration for the sale of said property above described, the said M. E. Somerford assumed and agreed to pay one certain second mortgage or deed of trust upon the above described property, said mortgage being for the sum of $8750.00 and being in favor of John R. Hollis, a more complete description of said mortgage and the note being described in the deed from J. C. Querry and wife, Minnie L. McQuerry to M. E. Somerford, duly recorded in the deed records of Chaves.

County, New Mexico, Book 70 page 345, to which reference is here made for a better description, on which said note there was due at time of foreclosure sale, the sum of $10,559.47.

"And Whereas, said note and lien was, for a valuable consideration, sold, transferred and conveyed, by written transfer duly recorded, to B. D. Loving, who is now the legal holder and owner of said note and the lien securing same. (page 8) Page 2, Mtg. Release, U/245

"And Whereas, said, note, with all interest and costs in connection with said foreclosure sale has been fully paid to B. D. Loving, the legal and equitable holder and owner of said note.

"Now, Therefore, Know all Men by these Presents, That, I, B. D. Loving, of Moran, Texas, in consideration of the premises and of the full and final payment of said note secured by said mortgage upon the above described property, the receipt of which is hereby acknowledged, have this day and do by these presents release, discharge and quit claim unto the said M. E. Somerford, his heirs and assigns, all the right, title, interest and estate in and to the above described property, which I have or may be entitled to by virtue of said note and do hereby declare the same fully released and discharged from any and all liens created by virtue of said mortgage above mentioned.

"Witness my hand this the 1st day of April, 1929.

"B. D. Loving

"State of Texas }
"County of Shackelford }

"Before me, the undersigned, a Notary Public in and for Shackelford County, Texas, on this day personally appeared B. D. Loving, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

"Given under my hand and seal of office this the 1st day of April, 1929.
"(Notarial Seal.)        J. A. Wohlford,
                "Notary Public in
                and For Stephens
                County Texas."

It will be noted that the foregoing "Release" purports to include all 2,000 acres.

Somerford died in San Angelo, Texas, on February 5, 1930, leaving surviving as his sole and only heirs his widow, the appellant here, and three children all of whom have executed Quitclaim Deeds to the appellant.

Following these transactions, the land in controversy was rendered for taxation and taxes were timely paid by Loving

from 1929 through 1945, it was rendered in 1946 by Loving and paid by Bruce K. Matlock, it was rendered and paid in 1947 and 1948 by Bruce K. Matlock.

On March 23, 1946, a warranty deed was executed and delivered by Loving and wife to Bruce K. Matlock, one of the appellees herein, covering the 640 acres in question. Consideration for this deed was fixed at $4,800, and on December 11, 1946, an undivided one-twelfth (1/12) mineral interest was conveyed by Matlock and wife to Marshall & Winston, Inc., the other appellee herein.

The foregoing constitute the facts relating generally to the chain of title asserted by appellant and appellees, and although lengthy, are necessary for a full consideration of the case.

The pertinent findings of fact made by the Trial Court are as follows:

"1. That the Court has jurisdiction of the parties hereto and the subject matter herein and that service of process upon all of the parties hereto has been good and sufficient.

"2. That all of the defendants in this cause have defaulted except the defendant, Ruby Somerford, and De-Witt Clarence *Huntly*, Jr., and that the defendant, DeWitt Clarence Huntley, Jr., has entered his appearance herein and consented to the entry of a decree quieting title against him and that a Certificate of Non-Appearance has been issued by the Clerk of this Court as to the other defaulting defendants.

"3. That B. D. Loving was the ownwr and holder of a first and prior mortgage on the land in controversy and that said mortgage was foreclosed in Cause No. 6937 in the District Court of Chaves County and pursuant to the Final Decree entered therein on December 7, 1928, a Special Master's Deed was executed and delivered to B. D. Loving, said deed being dated December 7, 1928, and recorded in Book 71 of Deed Records, page 84 and that there was no redemption from the foreclosure sale.

"4. That no consideration of whatsoever nature was paid to B. D. Loving by M. E. Somerford for the instrument designated as a 'release' found at page 8 of Abstract No. 11427, which is Exhibit P–14. The parties to said instrument did not intend thereby to convey unto the grantee any interest in the land in controversy and their sole intention in executing the instrument was to release M. E. Somerford from any personal liability by reason of the judgment rendered in the foreclosure action.

"5. That the plaintiff were bona fide purchasers for a valuable consideration of the land in controversy.

354

"6. That the plaintiffs and their predecessors in title have been in the sole, exclusive, actual, notorious, hostile and continual possession of the land in controversy since 1930, claiming under color of title and are still in possession of said land, and the plaintiffs rendered said property for taxes and paid the taxes thereon continuously from the year 1930 to the time of the filing of this action.

"7. That the plaintiff, Bonnie H. Matlock, is the owner in fee simple and in possession of the following described property in Chaves County, New Mexico:

(Here description is given)

"8. That the plaintiff, Marshall & Winston, Inc., is the owner in fee simple and in possession of an undivided ½₂ interest in and to all of the oil, gas and other minerals in and under and that may be produced from the following described land in Chaves County, New Mexico, to-wit:—

(Here description is given)

"11. That the defendant and counter claimant, Ruby Somerford, was never in possession of the land in controversy at any time after December 7, 1928, did nothing to enhance the value of the land and never rendered the property for taxes at any time from December 7, 1928, to the date of the filing of this action.

"12. That the plaintiffs and their predecessors in title never had any actual knowledge that the defendant and counter claimant was claiming the land in controversy until after the filing of this action.

"13. That the defendant and counter claimant, Ruby Somerford, knew, or in the exercise of reasonable diligence would have known, as early as 1931 all of the facts which are material to the establishment of her rights as set forth in her counter-claim.

"14. That the defendant and counter claimant, Ruby Somerford, did not exercise due diligence to ascertain the nature and extent of her claim to the lands in controversy.

"15. That by reason of the delay of the defendant and counter claimant in asserting her claim, persons having personal knowledge of the facts pertinent to the issues of this case have died and certain records are no longer available, and as a result thereof the plaintiffs were handicapped in the preparation for and trial of this case.

"16. That all the defendants make claim adverse to the estates of the plaintiffs in the above described lands and said claim is inferior to that of the plaintiffs.

"17. That the value of the land in controversy has greatly increased since 1931.

"18. That the judgment roll in Cause No. 6937 in the District Court of Chaves County, M. E. Somerford, et al vs. DeWitt Clarence Huntley, M. E. Somerford, et al, does not reveal facts which would make the judgment void and subject to a collateral attack at this time by the defendant and counter-claimant, Ruby Somerford.

"19. That B. D. Loving was married to Minnie Loving on January 4, 1893 and was married to her at all times to and including August 27, 1955."

The pertinent Conclusions of law made by the trial court are as follows:

"1. That the defendant and counter-claimant Ruby Somerford is barred by her laches from asserting any claim to the land involved in this case by reason of the passage of time, the increase in the value of the land, the loss of witnesses and evidence which might have been available had her claim been asserted within a reasonable time.

"2. That the Special Master's Deed dated December 7, 1928 executed by Mabel Richardson, Special Master, in favor of B. D. Loving recorded in Book 71, Page 84, is a valid conveyance and conveyed title to the land in controversy to the grantee.

"3. That the plaintiff, Bonnie H. Matlock, is the owner in fee simple and in possession of the following described property in Chaves County, New Mexico:

(Here description is given)

"4. That the Plaintiff, Marshall & Winston, Inc., is the owner in fee simple and in possession of an undivided $\frac{1}{12}$ interest in and to all of the oil, gas and other minerals in and under and that may be produced from the following described land in Chaves County, New Mexico, to-wit:

(Here description is given)

"5. That the plaintiffs, Bonnie H. Matlock and Marshall & Winston, Inc., are entitled to a decree quieting title to their respective insterests in the land in controversy as set out in their complaint in this cause and that the defendants, jointly and severally, should be barred from hereafter asserting claim of any character adverse thereto.

"6. That the Amended Cross Claim of the defendant, Ruby Somerford, should be dismissed.

"All Requested Findings of Fact and Conclusions of Law inconsistent herewith are hereby refused."

The general facts having been stated and the pertinent findings and conclusions of the Trial Court having been set out we now approach appellant's assignments of error or such of them as may be necessary for a determination of this appeal.

Appellant's first point relied on for reversal is that the Loving decree of mortgage foreclosure in cause No. 6937 supra was void for want of jurisdiction and that consequently the Loving Special Master's Deed, issued pursuant thereto, being appellees' source of claim of title, was also void.

Appellant relies primarily on the case of Walter v. Richardson, 62 N.M. 152, 306 P.2d 643. There was in that case, however, no substituted service whatsoever against the non-resident defendant. In cause No. 6937 supra, it affirmatively appears that there was substituted service as required by law against defendant Somerford in the initial foreclosure proceedings instituted by Singleton Trustee, a distinction which we merely point out without it being necessary to decide its effect in this case.

Furthermore in the Walter case there was neither personal service within the State nor substituted service outside the State and the plaintiff went ahead and obtained not a judgment in attachment but a personal money judgment on his complaint on which judgment execution was issued, a levy made on the execution by the sheriff followed by a sheriff's sale through which title was claimed by the plaintiff. Obviously, no personal money judgment could be valid under such a state of process of service and consequently any subsequent sheriff's deed would be ineffective to convey title.

Appellants also rely on the case of Larkin v. Folsom Town and Investment Company, 61 N.M. 441, 301 P.2d 1091, 1094, in which this writer was the trial judge in the lower court. That case was tried upon written stipulated facts resulting from a pre-trial conference and the facts set out in the stipulation affirmatively showed a complete lack of jurisdiction in the original attachment suit that resulted in the Special Master's Deed that was voided by the trial court. There was an affirmative showing made through the stipulated facts and the record that no order of court was ever entered authorizing or directing notice of suit, nor was notice of suit served on the defendants who were non-residents of New Mexico and were residents of the State of Colorado; and of course, there was no notice by publication. Some papers were served in Colorado but not the requisite ones prescribed by law and these matters appeared affirmatively and clearly from the record and stipulated facts. This court in the Larkin case went further and said:

"There is so much wrong with the whole attachment proceedings from its beginning until the end * * * that it would be purely an act of supererogation to do more than cite a few cases to demonstrate the fatal irregularity in essential steps disclosed by this record."

In cause No. 6937 involved in the case at bar, the most that can be said is that the record is silent as to whether or not there was publication, etc., as to Loving's Cross-Complaint on Somerford, if such was necessary; although, here again it affirmatively appears that there was full and complete substituted service on Somerford as to Singleton Trustee's foreclosure against Somerford and an appearance by Loving as cross-complainant who had also been a defendant along with Somerford which resulted in the judgment sought to be voided by appellants on jurisdictional grounds.

The Walter case and the Larkin case are not controlling here.

The controlling principle on this point we believe to be found in as recent a case as Atlantic Refining Company v. Jones, 63 N.M. 236, 316 P.2d 557, 560, where the prior holdings of this court are reviewed. Suffice it to quote only from that case as follows:

"That the challenge by the defendant, Emily Tate Jones, to validity of the Kansas decree represents a collateral attack on same can hardly be doubted. See, City of Albuquerque v. Huddleston, 55 N.M. 240, 230 P.2d 972; Kutz Canon Oil & Gas Co. v. Harr, 56 N.M. 358, 244 P.2d 522. Indeed, neither party questions that the present attack is collateral. Such being true, what presumptions of regularity and validity attend the judgment of a court of general jurisdiction when so attacked? In McDonald v. Padilla, 53 N.M. 116, 202 P.2d 970, 973, we said:

"'* * * every presumption not inconsistent with the record, is to be indulged in favor of the jurisdiction of courts of general jurisdiction whose judgments are collaterally attacked; and their judgments, though void for want of jurisdiction and would be so held on direct attack, cannot be questioned on that ground when attacked collaterally, unless the lack of jurisdiction appears affirmatively in the judgment roll.'

"The doctrine as thus laid down in McDonald v. Padilla is supported by our decisions in Bounds v. Carner, 53 N.M. 234, 205 P.2d 216; City of Albuquerque v. Huddleston, supra; Jencks v. Goforth, 57 N.M. 627, 261 P. 2d 655; Adams & McGahey v. Neill, 58 N.M. 782, 276 P.2d 913, 51 A.L.R.2d 830."

■ Tested by the foregoing principles we must and do hold that the Loving judgment on his counter-claim against Somerford in cause No. 6937 supra must be upheld as well as the validity of the subsequent Special Master's Deed to Loving.

The next point we are called upon is to determine whether the lower court erred in the construction placed on the so called "Release" set out above which was executed by Loving to Somerford subsequent to his obtaining the Special Master's Deed to the 640 acres here involved on his counter-claim in cause No. 6937 supra.

The lower court found as follows as to the said release:

"That no consideration of whatsoever nature was paid to B. D. Loving by M. E. Somerford for the instrument designated as a "release" found at Page 8 of Abstract No. 11427, which is Exhibit P–14. The parties to said instrument did not intend thereby to convey unto the grantee any interest in the land in controversy and their sole intention in executing the instrument was to release M. E. Somerford from any personal liability by reason of the judgment rendered in the foreclosure action."

Appellant's assigned error is stated as follows:

"The 'Release' of B. D. Loving Was Plain and Unambiguous in Its Terms and an Effective Acknowledgment of Redemption, and Evidence to Vary Its Terms Was Inadmissible."

Appellant calls our attention to the general rule which forbids the introduction of parol evidence to vary, contradict, or defeat a written instrument.

Bearing in mind that Somerford was the record holder of the title in the foreclosure Cause No. 6937 and that after Loving acquired title by Special Master's Deed he and his successors in title have been the only ones to exercise dominion over the 640 tract, return the same for taxes and pay the taxes from 1928 on, and bearing in mind on the other hand that Somerford and his surviving heirs exercised no dominion at all over the property all these years, and no consideration having been paid Loving for the "Release", and Loving's wife not having joined in the instrument, would cause any reasonable person to wonder how claim could now be made by the Somerfords' to this land based on the so called "Release" executed by Loving to Somerford. It might be construed as a conveyance, except Loving's wife did not join him. It might be construed as an acknowledgment of redemption and here again Loving's wife did not join him for whatever effect that may have; or, it might be construed as a release of Somerford from any personal liability to Loving by reason of the judgment rendered in the foreclosure action, which Loving could legally

do alone without his wife's joinder. The latter construction was applied by the Trial Court.

That the instrument is ambiguous is verified by the fact that in the lower court the parties as well as the court were thoroughly confused about the instrument. Appellants in the trial court did not know whether to call it a conveyance or an acknowledgment of redemption and ended up by calling it both in the amended second defense. Furthermore the trial court indicated at a pre-trial conference that the instrument would be considered an acknowledgment of redemption, but during the trial the court again examined the instrument and concluded it was ambiguous in its wording and uncertain as to the intent of the parties Loving and Somerford, and received evidence of Loving by way of deposition, over objection.

Loving was then eighty-four years of age and very hard of hearing. He testified as follows:

"Direct Examination

"Q. Do you know who M. E. Somerford is? A. Do I know him? Yes, Sir.

"Q. Yes, sir. A. Well, I just know him by sight. I saw him twice and that's about all I know about him.

"Q. What kind of dealings did you have with him? A. Well, it was all right, I guess, but I didn't have no confidence in him to be straight, not a bit in the world.

"Q. But what were your dealings with him? A. What were my dealings with him?

"Q. Yes, Sir. A. Well, I don't know. He just claimed to have some interest in this land before it was ever foreclosed, and I didn't know anything about it. I didn't know what interest he had in it. It just had his name in the abstract and that's all I knew about the fellow. I didn't even know what interest he claimed. I don't think he had any, but his name was in the abstract and that's all that I knew.

\*   \*   \*   \*   \*   \*

"Q. Now, Mr. Loving the public records of Chaves County, New Mexico show that at Book U of Satisfactions, page 245, there was filed in the County Clerk's office an instrument that you gave M. E. Somerford entitled a release dated April 1, 1929. Do you recall giving him that release? A. Well, I don't know what you call a release.

"Q. Did you ever sign a paper that he gave you? A. I signed two different papers at two different times. I don't know what the first one was. I don't remember whether it was on a release or what it was.

360

"Q. Just state what dealings you had with Mr. Somerford. A. Just state what difference?

"Q. No, what dealings you had with him? A. I didn't have any. I just signed those two papers. He never stayed there 15 minutes either time.

"Q. What did he ask you to do? A. Well, he just asked me to sign some kind of paper, but I didn't know what it was. I couldn't read it and he just told me what was in it. I couldn't read it.

"Q. Why couldn't you read it? A. I didn't have my glasses.

"Q. Where were you at that time? A. Out in the field about a mile from home.

"Q. Did you go to see him or did he come to see you? A. He come to see me.

"Q. Did you agree to sign the papers? A. Yes, I signed the paper after he told me what was in it. He was supposed to tell me what was in it.

"Q. What did he tell you was in it? A. *He said there wasn't nothing in it but just paper releasing him from any comeback on him if anybody should get hold of the land, or something. He said if they had any comeback on him that that would bar everybody and nobody couldn't come back on him or get the land in any way. That's the way he explained it to me.* (Emphasis ours.)

"Q. Did you know that that was a mortgage release at the time you signed it? A. A what?

"Q. Did you know this was a mortgage release? A. No, he didn't tell me that.

\* \* \* \* \* \*

"Q. I will ask you to state whether or not you received any money in payment of the McQuerry mortgage at the time this release was given? A. No, sir.

"Q. Were you ever paid anything on the McQuerry mortgage? A. Not a dime.

"Q. Was there promise or was there any agreement to pay you anything on the McQuerry mortgage for signing this release? A. No, sir.

\* \* \* \* \* \*

"Q. Did you ever see or hear from M. E. Somerford after you gave him that release? A. No, sir. It wasn't long after that until he died and I never saw or hear anything about him any more.

"Q. When did you learn that he had died? A. Well, I don't remember what year it was or what time, but I

just remember hearing in some way that he was dead.

"Q. Was he a personal friend of yours? A. No, I never knew him long. I wasn't his personal friend.

"Q. Now, one last question, Mr. Loving. I would like for you to go over the conversation that you had with Mr. M. E. Somerford on the day that you gave him this release. What did he tell you about getting the release? A. Well, what do you call a release? Was it the last one he brought to me or the first one?

"Q. Well, did he bring you any release to sign? A. Well, he brought me two pieces of paper. They were just written pages. I can't remember what was on the other one. I read the other one, but I don't remember what it was. I didn't read the other one and he just told me what was in it.

"Q. Well, I would like for you to tell what happened in connection with both papers, what he told you about the signing of both papers? A. Well, I don't know how to tell it. I didn't know what was in it.

"Q. Did he give you a reason why he wanted you to sign them? A. Sir?

"Q. Did he tell you why he wanted you to sign them? A. No, he never said anything about it, only on that last one. *He just told me it was something for me to sign releasing him from any obligations in any way in regard to that land, if somebody was to get hold of it sometime and come back on him about something, that it would release him from any danger like that. He said that was all it amounted to.* (Emphasis ours.)

*    *    *    *    *    *

"Q. I will ask you to state whether or not M. E. Somerford advised you that he was exercising his right of redemption on the McQuerry mortgage at the time he gave you the release? A. I didn't understand.

*    *    *    *    *    *

"Q. Did he say whether or not he was redeeming this land? A. No, sir.

"Q. When you signed the release? A. No, he never said anything to me about that.

"Q. Do you know who prepared that last instrument that you signed? Do you know the name of the lawyer or whoever prepared it? A. No, It was just a written piece of paper something like about that long. I don't reckon there was any name to it. I allowed he wrote it out himself. If it was done by any lawyer, I don't remember there being any lawyer's name on it.

362

"Cross Examination

"Q. Mr. Loving let me ask you a few questions about this particular transaction. Up until about two or possibly three years ago this particular transaction was away back in your mind, wasn't it, and you had forgotten all about it? A. Yes, sir.

"Q. There wasn't anything important about it, was there? A. *No, not a thing in the world, except to release him from some kind of hold that somebody might get on it and Forever remove their hold on it.* Now, that's the way he explained it to me. (Emphasis ours.)

\* \* \* \* \* \*

"Q. *Well, if Mr. Somerford was not responsible to you for the payment of any indebtedness why do you think he would have been asking you to sign something releasing him from any indebtedness? A. Well, I don't know. He wasn't in no way as I ever remember or understood had anything to do with paying me. These notes was all on Mr. McQuerry.* (Emphasis ours.)

"Q. Well, why did he come to see you in the first place, if you can remember? A. He come to my home one night.

"Q. Well, why? A. Well, he wanted me to sign a paper. I reckon it must have about a release in some

way. It was releasing him somehow. I don't know just what it was now.

"Q. You say he brought the first paper to your home at night? A. Yes, sir.

"Q. Did you read that paper? A. I don't remember whether I read it or not.

"Q. Well, did you or did you not sign the first paper that he brought to you? A. Yes, I signed it, but I didn't read it. He told me. I think I did read that and he told me too what it was. I reckon it was just some kind of release that released him from something.

"Q. Now, actually, the land was worth very little, wasn't it? A. Yes, it wasn't worth but very little.

"Q. And you signed that instrument before Mr. Wholford, who was a notary public in and for Stephens County, Texas, wasn't he? A. Yes, sir.

"Q. And you say you didn't have your glasses with you when you first saw the instrument? A. No sir, I didn't have them with me so I could see to read it.

"Q. Well, you looked at it before you signed it before the notary public, didn't you? A. No, I couldn't see to read it. I didn't have no glasses.

"Q. You say he brought it to you out in the field? A. Yes, sir.

"Q. Is that the one he brought to you out in the field, the one you signed before J. A. Wohlford, a notary public? A. Yes, sir.

"Q. Was Mr. Wohlford with him when he brought the instrument out to the field? A. No, we went over to his house.

"Q. Well, Mr. Wohlford lived away over in another community, didn't he? A. Well, not over a mile and a half or two miles from me.

"Q. What was the name of that community you said he lived in? A. Eureka neighborhood.

"Q. Did you stop by your house and get your glasses before you went to Mr. Wohlford's house? A. No, I didn't go by my house. I was back the other way. The house was back the other way from his house. I was going from my house all the time.

"Q. Did you ask Mr. Wohlford to look over this instrument? A. No, I don't think I did. I might have, but if I did I have forgot it.

\* \* \* \* \* \*

"Q. I say your memory is real hazy on that at this time, isn't it? A. Well, I guess it is. I never had thought anything about it. I never even studied about it. It didn't take long and I didn't try to remember anything much about it. *The way he explained it, it was just releasing him from anything that might come up afterwards.* (Emphasis ours.)

\* \* \* \* \* \*

"Q. Do you think there might have been some consideration passed between him and you in this instrument that you signed, turning the land back to him? A. *Not that I remember.* (Emphasis ours.)

"Q. Well, you wouldn't say that there might not have been some kind of consideration would you? A. No, but he wasn't into it after this fellow traded me the notes.

"Q. I know, but as between you and Mr. Somerford in 1929, you wouldn't say that some consideration didn't pass from Mr. Somerford to you for executing this instrument, would you? A. No.

"Q. Your memory is real hazy about that, isn't it? A. Well, I don't remember anything about it.

"Q. He could have paid you something for that, couldn't he? A. Something for it?

"Q. Yes, sir. A. *No, I don't reckon he did. I don't know that he had any right, and I don't reckon I had any*

*right to look to him for anything at all.* (Emphasis ours.)

"Q. I know, but he might have paid you some money himself in exchange for the execution by you of this release as far as you can remember? A. Paid me some money?

"Q. Yes, sir. A. *No, he never paid me no money for nothing.* (Emphasis ours.)

"Q. Well, your memory is pretty hazy about that, isn't it? A. Well, yes.

"Q. Isn't it possible that he did pay you some money, or he might have paid you some money, in exchange for this release, even though it may not have been very much money? A. *He never paid me no money for nothing.* (Emphasis ours.)

"Q. You are positive about that? A. Well, I reckon I am. If he had paid me for it I would have remembered it.

\* \* \* \* \* \*

"Redirect Examination

"Q. Mr. Loving, is J. A. Wohlford still living? A. No, sir.

"Q. When did he die, do you remember? A. No, I don't know just how long ago it has been, but it seems to me like it was about five or six years ago as well as I remember.

"Q. Did you ever learn whether or not Mr. Somerford claimed an interest in this land after you gave him that instrument? A. No, sir, I never did know anything about it.

"Q. Have you ever owned any land in New Mexico other than this 640 acres? A. No, sir.

\* \* \* \* \* \*

"Q. *Now, I think you testified that Mr. Somerford represented to you that this was a release only. Is that right? A. Well, I reckon you would call it a release. He said it was releasing him from any obligation, where anybody might come back on him for something down through the years. That's the way he made me understand what it was. That's how come me to sign it.* (Emphasis ours.)

"Q. Was there any mention made about that instrument being a deed to the property? A. No, sir.

"Q. Would you have given it to him if you had known that had been a deed? A. No, sir, I sure wouldn't.

\* \* \* \* \* \*

"A. It didn't occur to me that he was trying to get a hold on the land in some way.

"Q. What do you mean by that? A. What do I mean? Well, I mean just what I said. *He didn't say any-*

*thing about it being any hold on the land in any way at all. I didn't think about any such thing at all that would give him any kind of hold or claim on the land in some way."* (Emphasis ours.)

■ Although this is obviously a borderline situation, to say the least, we are nevertheless of the opinion that under all the circumstances in this case the trial court was not in error in admitting the testimony of Loving to throw light on this confusing transaction.

Some complaint is made also to certain letters received in evidence by the trial court touching this "Release" as being hearsay, etc. However, this was not a cause tried to a jury but rather to the court alone, and it must be presumed that the court either disregarded the letters or gave them little significance. In any event the testimony by deposition of the witness Loving constitutes in and of itself, substantial evidence to uphold the finding above set out made by the trial court with reference to the so-called "Release" to the effect that the "Release" constituted a mere release from personal liability without relinquishment of any interest in the land.

We hold therefore that under the facts in this case the trial court was justified in applying the rules aptly stated as follows:

"In order correctly to ascertain the intentions of the parties to a deed, contract, or other instrument of writing, and properly to interpret the same, it is competent to inquire into the purpose for which the writing was executed, and to this end parol evidence is admissible." 32 C.J.S. Evidence § 960, p. 909.

"Parol evidence is admissible to show the situation of the parties and the circumstances under which a written instrument was executed, for the purpose of ascertaining the intentions of the parties and properly construing the writing. In other words, the court may, by receiving evidence of the circumstances under which the writing was made, place itself in the situation of the parties who made it, and to that extent look in on their minds and so judge of the meaning of the words, and of the correct application of the language to the thing described, from the point of view of the parties who wrote or executed the instrument." 32 C.J.S. Evidence § 960, p. 911.

■ The lower court also held, in any event, that even if the Special Master's Deed to Loving was void for lack of jurisdiction over Somerford in Cause No. 6937, and consequently conveyed no title to Loving, that such deed nevertheless constituted color of title as the basis for appellee's alternate claim to title by adverse possession. With this conclusion we also agree in view of our upholding the trial court's

finding and conclusion that by executing the so called "Release" to Somerford, Loving did not thereby divest himself of title. Turner v. Sanchez, 50 N.M. 15, 168 P.2d 96, 164 A.L.R. 1280; Witherspoon v. Brummett, 50 N.M. 303, 176 P.2d 187; Heron v. Garcia, 52 N.M. 389, 199 P.2d 1003; Westmoreland v. Curbello, 58 N.M. 622, 274 P.2d 143; Quintana v. Montoya, 64 N.M. 464, 330 P.2d 549.

The judgment entered in the lower court will be affirmed.

It is so ordered.

LUJAN, C. J., and COMPTON and SHILLINGLAW, JJ., concur.

McGHEE, J., not participating.