410 P.2d 403

Lucille R. (Mrs. Guy) JACK, Annie May Kavanaugh, Florence Jack Mayo, William Howard Jack, Acting By and Through his guardian, W. M. Beauchamp, Mack Easley, John Quinn, J. H. Daws, Dorothy Beaty Mitchell, Virginia Mitchell Lee, Dr. Charles S. Mitchell, Jr., and Dorothy Mitchell Latady, Plaintiffs-Appellees,

v.

N. B. HUNT, W. H. Hunt, Lamar Hunt and Carter Foundation Production Company, Defendants-Appellants.

No. 7645.

Supreme Court of New Mexico.

Jan. 24, 1966.

Rose and Johnson, Hobbs, for appellants.

Robert W. Ward, Lovington, for appellees.

CHAVEZ, Justice.

This is an appeal from a judgment of the district court of Lea County, New Mexico. The issue on appeal is the construction of a contract in which plaintiffs and the defendants who answered, as successors in title to the original contracting parties, now occupy the respective positions of the original contracting parties.

On January 29, 1963, plaintiffs-appellees filed their complaint in a suit to quiet title against N. B. Hunt, W. H. Hunt, Lamar Hunt, Carter Foundation Production Company, unknown heirs of certain deceased persons in the chain of title of certain of the plaintiffs, and all unknown claimants of interest in the premises adverse to the estate of plaintiffs. The complaint asserts that plaintiffs collectively are the owners in fee simple of a 2½% overriding royalty interest in all oil and gas produced and saved from lands in Lea County, New Mexico, described in the complaint, of which defendants N. B. Hunt, W. H. Hunt Lamar Hunt and Carter Foundation Production Company are the operators under an oil and gas lease in which the United States of America is lessor. Defendants N. B. Hunt, W. H. Hunt, and Lamar Hunt are the operators of one portion of the lands and Carter Foundation Production Company is the operator of the other. No answer was filed on behalf of the unknown heirs of the deceased persons named as defendants, or by unknown claimants of interest in the premises.

Defendants-appellants, the Hunts and Carter Foundation Production Company, joined in a single answer, timely filed, in which defendants denied that plaintiffs were the owners of any overriding royalty

in oil or gas or other related substances at that time producible from the land. The denial of the right of plaintiffs to the overriding royalty was not a challenge to the chain of title of any of the plaintiffs. The denial was on the ground that the entitlement, which plaintiffs had once had to the overriding royalty, ceased to exist when the United States increased its royalty rate from 5% to 12½%.

The case was tried before the district court on August 22, 1963. On November 18, 1963, the trial court filed an opinion in which the court construed the contract to mean that, as to the "(A)" lease, 87½% of production would belong to the contractor and 7½% to the owner. The court further reasoned that, since both parties were aware that the 5% royalties to the United States could be increased by the government after 20 years and since no provision was made covering such contingency, and since both parties were bound to obtain a renewal lease at that time to protect their interests, then each party must bear his proportionate share of the additional royalty.

Counsel for both plaintiffs and defendants filed requested findings of fact and conclusions of law. Plaintiffs, in their requested findings of fact and conclusions of law, adopted the theory of the case contained in the trial court's opinion and abandoned their claim to the smaller portion of the overriding royalty, which the trial court said had been wiped out by the increase in the royalty required by the United States.

On February 17, 1964, the trial court filed its decision in which it adopted plaintiffs' requested findings of fact and conclusions of law and denied the requested findings of fact and conclusions of law of defendants.

The trial court filed its final decree on February 17, 1964, consonant with its opinion and decision previously filed. The decree quieted the titles of plaintiffs collectively to 2.30% of overriding royalty against the adverse claims of all of the defendants. The defendants denominated "Unknown Heirs of the Following Named Deceased Persons, to-wit: E. E. Jack, Abner M. Jack, Guy M. Jack, Charles S. Mitchell; Unknown Claimants of Interest in the Premises Adverse to the Estate of the Plaintiffs," who had failed to plead or answer, were found to be in default and judgment by default was rendered against them. The defendants N. B. Hunt, W. H. Hunt, Lamar Hunt and Carter Foundation Production Company have appealed.

The undisputed facts, as found by the trial court are:

"2. That the rights of the parties were initiated by a Prospecting Permit, Las Cruces No. 032339, issued by the United States of America, running to G. H. Mattix,

dated December 1, 1926, covering, among other lands:

"The North half (N/2) and the Southeast quarter (SE/4) and the East half of the Southwest quarter (E/2 SW/4) of Section 3, Township 24 South, Range 37 East, N.M.P.M. Lea County, New Mexico.

"3. That under date of February 2, 1927, G. H. Mattix, as owner and Marland Oil Company of Colorado entered into a drilling contract, covering the above described lands and the other lands included within the above described Prospecting Permit. That said drilling contract provided in part:

" 'Section 4. That on that part of the lands embraced in said permit which shall be leased to the owner at the minimum royalty of 5 per cent, the contractor for its services and expenditures hereunder shall be entitled to retain 87½ per cent of the total amount of all oil and/or gas produced and saved therefrom. Of the remaining 12½ per cent of said total amount, 5 per cent shall by the contractor be turned over or its value paid to the United States as its royalty and the balance of 7½ per cent shall belong to the owner.'

That by Article 2, Section 4, such operating agreement provided:

" 'That upon discovery of oil or gas in paying quantities upon any of the lands above mentioned, the contractor shall have the right to designate one-quarter of the area embraced within said permit, and the owner covenants that he will thereupon, on request of the contractor, apply to the Secretary of the Interior for a preference lease thereon at a royalty of 5 per cent, and at the same time, and in like manner, apply for a lease upon the entire balance of said permit area upon such royalty as the Secretary of the Interior may fix and that owner will sign all papers and take all necessary steps to obtain the granting of such leases and any renewals thereof requested by the contractor.'

That by Article 3, Section 1, it was provided:

" 'That this agreement and each and every one of its terms, provisions and conditions shall

be binding upon and inure to the benefit of the heirs, personal representatives, successors and assigns of the parties hereto.'

"4. That after the execution of the operating agreement in the Finding next above, oil and gas in paying quantities were found by contractor upon the above described lands; that contractor selected the above described lands as those to be included in the preferential or 'A' lease; that G. H. Mattix as permittee (owner) made application to the United States of America for an oil and gas lease upon the same and that under date of November 4, 1935, an oil and gas lease was issued by the United States of America, running to G. H. Mattix for a term of 20 years, with the preferential right to renew for successive periods of 10 years upon such reasonable terms and conditions as might be prescribed by the United States of America. That such lease was in compliance with the laws and rules and regulations of the United States of America.

"5. That exercising her preferential right to obtain a renewal lease, Joy Mattix Stanley, as heir of the original permittee, G. H. Mattix, made application to and obtained an oil and gas lease from the United States of America, dated November 1, 1955, being for a term of 10 years with the preferential right to renew such lease for successive periods of 10 years, covering the above described property.

"6. That the Plaintiffs in this action derive their title by assignment from the permittee, G. H. Mattix, which assignment contained the following provision:

" 'The party of the first part (G. H. Mattix) hereby agrees that the party of the second part (predecessor in interest to Plaintiffs) shall succeed to all of the rights, benefits and privileges owned by the first party in and to the said 2½ per cent of all oil, gas which may be produced, saved and marketed hereinabove conveyed.'

That such assignment of the 2½ per cent overriding royalty covered the above described property and that such 2½ per cent overriding royalty, through inheritance, devises and assignments descended to and vest in the Plaintiffs in the above entitled cause,

in the percentages set forth in Plaintiffs' complaint.

"7. That the operating agreement between G. H. Mattix and Marland Oil Company above described vested in G. H. Mattix, his heirs, successors and assigns as an overriding royalty of 7½ per cent of the oil and gas which might thereafter be produced from the (a) lease (being that part of the permitted area on which a preferential lease could be issued by the United States at a royalty of 5 per cent of the oil and gas produced, after discovery of oil and gas on such preferred acreage under the then existing law) and vested 87½ per cent of the oil and gas produced from such 'A' lease in Marland Oil Company (contractor or operator). That prior to the issuance of the renewal lease covering the above described lands to Joy Mattix Stanley by the United States on November 1, 1955, the laws and regulations of the United States were amended to provide a minimum royalty, payable to the United States, of 12½ per cent under an 'A' lease, such as had originally been issued to G. H. Mattix. That the operating agreement between G. H. Mattix and Marland Oil Company failed to make any provision for the contingency that the United States might increase the royalty payable to an amount in excess of 5 per cent of the oil and gas produced on the issuance of a preferential renewal lease such as was issued to Joy Mattix Stanley on November 1, 1955.

"8. That the above entitled cause is an equitable proceeding and that the Court has equitable powers to grant relief and adjust the rights and obligations of the parties under facts and circumstances such as exist in the above entitled cause.

"9. That as the preferential renewal lease was issued to Joy Mattix Stanley, as heir of the original permittee, the parties and the government recognize the continuing rights of interest of the permittee in the above described lands."

The only question on appeal concerns certain conclusions of law adopted by the trial court.

Appellants list three propositions of law upon which they state the trial court should have reached a different decision. The first proposition states:

"Under the express terms of the contract between the parties the overriding royalty interest of the plaintiffs

was extinguished when the United States increased the royalty rate on the lands covered by the 'A' lease from 5% to 12½%."

Under this proposition of law appellants list 11 points. The first five allege error in the trial court's conclusions of law Nos. 2, 4, 5, 6 and 7, and the remainder allege the trial court's error in refusing to adopt appellants' requested conclusions of law Nos. 1 through 4, 7 and 8. This proposition of law is also based on appellants' affirmative defense No. I which, in essence, stated:

"That under the express terms of the Drilling and Operating Agreement (Exhibit B) the owner and his assigns are to receive no overriding royalty under any lease issued by the United States requiring as much as 12½% royalty, and under the express terms thereof the contractor is guaranteed 87½% of the oil and gas produced under any lease issued pursuant to the rights originating from the Oil and Gas Prospecting Permit (Exhibit A)."

Appellants do not contest the trial court's conclusion of law No. 1 which states:

"1. That the operating agreement between G. H. Mattix, as owner, and Marland Oil Company, as contractor, dated February 2, 1927 created a fiduciary relationship between the parties, which fiduciary relationship has remained in full force and effect at all times inuring to the benefit of and binding upon the heirs, devisees, assigns and successors in interest to the owner, G. H. Mattix, on the one hand, and the assigns and successors in interest of the contractor, Marland Oil Company, on the other."

Appellants attack the trial court's conclusion of law No. 2 which provides:

"2. That in the operating agreement of February 2, 1927, the intent and the purpose of the parties and the only effect of the language 'lands embraced in said permit which shall be leased to the owner at the minimum royalty of five percent' was to define that portion of the permitted area which would go into the preferential (a) lease after discovery of oil (which under existing laws was required to be contiguous to the discovery well so that it could not be described in advance) from the lands which would be contained in the (b) lease. After the discovery of oil and the issuance of the (a) lease, the rights of the parties became fixed and the language referring to the minimum royalty of five percent, having served its purpose, in no way affected the future rights of the parties."

Appellants argue that the language in Article I, Section 4, of the operating agreement means that on any lease to the owner, in which the government receives 5% royalty, 7½% of the royalties shall belong to the owner; and that the contractor should always receive 87½% royalties and the owners' royalties will be whatever remains after the government's royalties. Appellants emphasize that the word "lease" in Article I, Section 4, means that in all subsequent leases the contractor is to receive 87½% of the royalties, despite any increase in the government's royalties. Appellants disregard the wording in the same paragraph that, of the remaining 12½%, 7½% "shall belong" to the owner. We are of the opinion that the wording "the CONTRACTOR * * * shall be entitled to retain 87½ percent" was not intended by the parties to be an absolute provision in favor of the contractor, regardless of the percentage of the royalties the government might subsequently receive. This provision is not entitled to any more weight than that provision in favor of the owner, which provides that "7½ percent shall belong to the OWNER." We believe, as did the trial court, that the only effect of the above language is to describe the area covered by the agreement. Once the land was so described under the "A" lease, then the clause became useless and certainly did not limit the owners' royalty only to leases where the government received 5% royalty. This also answers ap-

pellants' similar contentions with regard to the wording of the assignment to appellees herein.

Appellants further argue that, since the renewal lease in question provides for royalties of 12½% to the government, the first part of Article I, Section 4, is inapplicable and the court must apply the second part of Section 4, which provides that should the government be given a royalty of 12½% or more, the owner will then be entitled to no royalty and the contractor would be entitled to all the royalty not taken by the government. We cannot follow appellants' reasoning on this point, primarily because the Act of February 25, 1920, U.S.C.A., Title 30, § 181 et seq., provided that the holder of a prospecting permit had the right, upon discovery of oil or gas, to select one-fourth of the total area embraced in his permit as the preferred acreage, and to receive a lease on this acreage for 20 years at 5% royalty ("A" lease). The Act further entitled the owner to receive a lease on the remaining three-fourths of the acreage for a term of 20 years at a royalty starting at 12½% and ascending according to production ("B" lease). The drilling and operating agreement was entered into pursuant to this Act and, by reading first the Act and then the agreement, it is quite obvious that Article I, Section 4, of the agreement contains provisions paralleling the Act's provisions, which set forth royalty proportions applicable to both the "A" lease (one-fourth

of the acreage) and the "B" lease (three-fourths of the acreage). That part of Article I, Section 4, which states:

"That on that part of the lands embraced in said permit which shall be leased to the OWNER at the minimum royalty of 5 per cent, the CONTRACTOR for its services and expenditures hereunder shall be entitled to retain 87½ percent of the total amount of all oil and/or gas produced and saved therefrom. Of the remaining 12½ per cent of said total amount, 5 per cent shall by the CONTRACTOR be turned over or its value paid to the United States as its royalty and the balance of 7½ per cent shall belong to the OWNER;"

is referring to the "A" lease; and the remainder of Article I, Section 4:

"that on that part of the lands embraced in said prospecting permit which shall be leased by the United States to the OWNER at a royalty of twelve and one-half per cent (12½%) or in excess of that amount—none—of the total amount of all oil and/or gas produced or saved therefrom shall belong to the OWNER, after turning over to the United States its royalty or the value thereof, and the CONTRACTOR for its services, expenses and assumption of obligations hereunder shall be entitled to all of the residue of the oil and/or

gas produced and saved therefrom. * * *"

refers to the "B" lease. Unless the agreement expressly provides, and it does not, there is no reason to apply the "B" lease provisions concerning royalties to the "A" lease when the "A" lease royalty to the government is increased from 5% to 12½%. See also a similar lease and its construction in Hughes v. Samedan Oil Corporation, (10 CCA 1948), 166 F.2d 871.

Appellants assert as erroneous the trial court's conclusion of law No. 4:

"4. That the operating agreement of February 2, 1927, is definite and certain in its terms as to the matters embraced in it, but fails to cover the contingency that the Secretary of Interior on a renewal of the original twenty-year (a) lease might reserve more than five percent royalty to the United States. That as the parties failed to provide for such contingency, the Court will do equity."

We agree with this conclusion, as shown above, and as is further evidenced by that part of Article 2, Section 4, of the agreement which states:

"That upon discovery of oil or gas in paying quantities upon any of the lands above mentioned, the CONTRACTOR shall have the right to designate one-quarter of the area embraced within

said permit, and the OWNER cove-. nants that he will thereupon, on request of the CONTRACTOR apply to the Secretary of the Interior for a preference lease thereon, at a royalty of 5 per cent, and at the same time, and in like manner, apply for a lease upon the entire balance of said permit area upon such royalty as the Secretary of the Interior may fix, * * *."

The primary points and propositions of appellants are substantially governed by Kutz Canon Oil & Gas Co. v. Harr, 56 N.M. 358, 244 P.2d 522. That case is pertinent to this question only insofar as it adjudicates the rights of Fred Feasel, an intervenor therein, and Kutz Canon. Feasel obtained a prospecting permit and thereafter entered into an operating agreement with one Mc-Carthy. Under the operating agreement McCarthy and his assigns were to perform the conditions of the agreement and, in the event of an oil or gas discovery, were to receive 7½% of the production of either from so much of the permit lands as might be included in a lease from the government at a 5% royalty. Subsequently Feasel was issued exchange and preference leases based on the prospecting permit and the operating agreement. Kutz and the other assigns, with Feasel's knowledge and approval, kept the operating agreement in full force and effect. The plaintiff and others, as successors in title to McCarthy, claimed an interest in Feasel's operating agreement and leases. Feasel claimed sole ownership of the lease standing in his name. The trial court found that, because of an amendment to the Federal Oil and Gas Leasing Act (the same statute and amendment as in the instant case), there was no portion of the lands embraced in said instrument on which a lease carrying a royalty of less than 12½% could be obtained; that because of this amendment it was impossible to carry out the original operating agreement between Feasel and McCarthy "in strict accordance with its terms" and that the court would protect Feasel and do equity. Prior to that suit, Kutz Canon and the other assignees had offered Feasel 7½% royalty of one-fourth of the land leased, which offer Feasel refused. The trial court, and this court in affirming, held that the offer by Kutz Canon gave Feasel substantially the rights he would get if it were possible to obtain a lease from the government carrying only 5% royalty.

The amendment to the Federal Oil and Gas Act required a royalty of 12½% to the government in all exchange leases. The discrepancy in the Kutz Canon case arose under the original prospecting permit and operating agreement providing for a 5% government royalty, and the amendment requiring 12½% royalty. Feasel argued that this discrepancy as to royalty rendered the operating agreement impossible of performance by McCarthy and his assigns, and thereby released Feasel from all obligations

under the operating agreement. After noting that Feasel would have been unable to obtain the exchange lease had not Kutz Canon and the other assigns kept the prospecting permit in full force, this court held that the original fiducial relationship between McCarthy and Feasel existed between Kutz Canon, the other assigns and Feasel, and that equity required Feasel to accept the tendered 7½% royalty.

In the instant case appellants agree that a fiduciary relationship exists, and that the operating agreement applies to all extensions and renewals of the prospecting permit and leases arising from said permit. Appellants agree that the terms of the operating agreement apply to the lease in question, but they contend that, by the terms of the permit, the royalty to appellees is extinguished.

In the Kutz Canon case we cited and quoted from Oldland v. Gray, (10 CCA 1950), 179 F.2d 408, where the court stated:

"It is contended, and the trial court finally held, that even though a fiducial relationship was created by the 1926 assignment, it was extinguished by the 1935 Amendment to the Leasing Act providing for exchange leases and a minimum royalty of 12½ per cent, or that it was certainly extinguished by the 1942 Amendment providing for new leases. It is clear, without doubt, that the 1935 Amendment did not extinguish

the permit or abrogate the rights of the parties hereunder. Instead, it expressly recognized the permit and the rights of the parties.· * * *

"But even though the subsequent legislation operated to extinguish the rights of the appellants as between them and the Government, it did not affect the rights of the parties under the private contract. As we have said, the rights of the parties here do not arise out of the federal act. They have their genesis in and derive their vitality from an agreement between the parties, which unless contrary to declared public policy, are enforceable in accordance with its terms and conditions and applicable law. See Blackner v. McDermott, 10 Cir., 176 F.2d 498. * * *"

The court then turned to another question raised there and in the instant case, namely, that in attempting to reach an equitable decision the trial court must necessarily rewrite the contract between the parties. The court disposed of this contention in the following manner:

"The parties now contend, and the trial court indicated, that to grant the relief sought by the appellants, the court must rewrite the contract. In that connection, it is pointed out that the permit contemplated 7½ per cent royalty on one-fourth of the permit area on which the royalty to the Government would be 5 per cent under Sec-

-tion 14 of the original Leasing Act, and 4 per cent royalty on three-fourths of the permit area on which the Government royalty was payable on a graduated scale, depending upon production. It is said that since the 1935 and 1942 Amendments provide for a minimum Government royalty of 12½ per cent, it is not within the equitable power of the court to fashion a decree which will give effect to the contract between the parties, and at the same time comply with federal law. But flexibility is one of the virtues of equity. Certainly equity will not be denied or hampered because of the imposition of intervening legislation. * * *"

Although the trial court apparently did so, appellants do not seek to distinguish the above cases because of the differences between a renewal lease and preference and exchange leases. While there is a difference, we see no reason to distinguish the above cases because, in the case before us and the cases cited, all renewal, preference and exchange leases were made under and covered by the original operating agreement. However, this argument is made by appellants in regard to the differences in wording of the various provisions in the cases cited and in the instant case. Although there is a difference in wording, the diversity is not sufficient to negate the effect of the decisions.

In this case Joy Mattix Stanley, the heir of the original permittee G. H. Mattix, applied for and obtained a renewal lease dated November 1, 1955. This lease renewed for 10 years the original 20-year "A" lease which expired November 3, 1955. The renewal lease, as required by the amended law, reserved a minimum 12½% royalty to the United States.

Article I, Section 1, of the drilling and operating agreement, clearly provides that the agreement covers all subsequent leases founded thereupon, such as the renewal lease in question. Article I, Section 3, gives the contractor complete charge and control of extensions or renewals of the permit. Article I, Section 5, protects the contractor by requiring the owner to notify the contractor in writing of the nature and cause of any forfeiture of rights under the agreement by the owner. Article I, Section 6, provides that the contractor may surrender all or part of any rights in the lands and be relieved of any obligations with respect thereto, only after 30-days' notice to the owner prior to the expiration of a permit or extension thereof. Article II, Section 4, provides that the contractor, upon the discovery of oil or gas, shall have the right to designate which lands will be in the "A" and "B" leases; and after such designation to the owner, the owner must apply for the lease or any renewal thereof requested by the contractor. Under Article III, Section

3, the owner covenants that he will not relinquish any of the lands, oil or gas, permit, lease or extensions thereof, without written consent of the contractor. By virtue of the various cross-covenants above set forth, the fiduciary relationship between the parties is established.

From the facts found by the trial court, it concluded that the operating agreement between G. H. Mattix, as owner, and the Marland Oil Company, as contractor, dated February 2, 1927, created a fiduciary relationship between Mattix, his heirs and assigns, and the assigns and successors in interest of the Marland Oil Company. We thus hold that equity was done in proportionately reducing the royalties of the parties in order to pay the increased government royalty. This conclusion is further strengthened by Article III, Section 4, of the operating agreement which provides:

"That nothing herein contained shall be construed as being in any manner in derogation of any of the terms, conditions or provisions of the Act of Congress under and by virtue of which said permit was issued, or of any regulations of the Department of the Interior of the United States lawfully promulgated thereunder; but, on the contrary, this agreement shall in all particulars be deemed amenable to reformation to

eliminate or modify any portions thereof found to be in contravention of the provisions of said Act or such regulations or against public policy, and shall remain and to be in full force and effect as to all provisions not so eliminated or modified."

Appellants argue that this court should give due effect to the word "eliminate" in the above provision and thereby eliminate the provision which gives appellants 87½% and the government 12½% of the royalty. As stated above, that provision applies to "B" leases of the parties and has no relation to the "A" leases. Further, appellants ignore the remainder of Article III, Section 4, which makes clear that "reformation" and "modification" of the agreement are equally as suitable as "elimination" of any provision, in the event of subsequent legislation inconsistent with the earlier agreement. In any event, the proportionate reduction of royalty by the trial court is more in line with the operating agreement and is the equitable disposition of the questions raised herein.

The judgment of the district court is affirmed.

It is so ordered.

CARMODY, C. J., and NOBLE, J., concur.